# IN THE SUPREME COURT OF IOWA

No. 14–0067

Filed April 29, 2016

**STATE OF IOWA,**

Appellee,

vs.

**MARVIS LATRELL JACKSON,**

Appellant.

___

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Johnson County, Robert E. Sosalla, Judge.

A defendant requests further review of a court of appeals decision affirming the denial of a motion to suppress evidence obtained after a police officer searched a closed backpack. **DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

Mark C. Smith, State Appellate Defender, and Rachel C. Regenold (until withdrawal) and Theresa R. Wilson, Assistant Appellate Defenders, for appellant.

Thomas J. Miller, Attorney General, Sharon K. Hall, Assistant Attorney General, Janet M. Lyness, County Attorney, Anne M. Lahey, Assistant County Attorney, for appellee.

**WIGGINS, Justice**.

A police officer conducted a warrantless search of a closed backpack belonging to the defendant. The officer relied on a third party's consent in conducting the search. The third party possessed actual authority to consent to a search of the bedroom the backpack was in but lacked actual authority to consent to a search of the backpack itself. The defendant moved to suppress the evidence found in the backpack and the fruits of the search on the ground that the third party had neither actual authority nor apparent authority to consent to the search of the backpack. He argued the warrantless search violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution and article I, section 8 of the Iowa Constitution. The district court denied the motion.

The defendant now seeks further review of a decision by the court of appeals affirming his convictions on two counts of robbery in the second degree. We conclude the warrantless search violated the Fourth Amendment of the United States Constitution because the third party who consented to the search of the bedroom lacked apparent authority to consent to the search of the defendant's backpack. Therefore, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case to the district court for a new trial.

## I. Background Facts.

On our de novo review, we find the following facts. At 12:35 a.m. on December 31, 2012, the Iowa City Police Department dispatched Officer Michael Smithey to Gumby's Pizza after receiving a report an armed robbery had just taken place. When Officer Smithey arrived on the scene, the robbery victim met him outside the restaurant. The victim reported he had been alone working in the kitchen when two black males

entered the restaurant wearing dark clothes, black hats, and black bandanas over their faces. One of the men had a gun and pointed it at the victim. The men ordered the victim to open the cash register. The victim complied and gave the men approximately $125 in small bills. After the men ran out of the store and headed northbound on Gilbert Street, the victim locked the door and called the police.

As Officer Smithey stood outside the restaurant speaking with the victim, a man approached and asked if there had been a robbery. The man stated he had just been standing outside smoking a cigarette when he observed two black males wearing dark clothes walk by. He noted one of the men appeared to be holding a fistful of cash. He also stated when the men saw him, they took off running between some houses.

Officer Smithey drove the witness to the location where he had last seen the men on foot. There was fresh snow on the ground, and Officer Smithey saw what appeared to be tracks in the snow. He then requested backup from a canine unit.

When the canine unit arrived, the handling officer and the canine tracked the suspects to the southeast corner of the building on South Gilbert Street. Officer Smithey followed, joined by Officer Alex Stricker. The officers observed the lower floor of the building was a retail location, but the second story contained apartments with outside doors accessed by a common stairwell in the rear of the building. As the officers visually surveyed the exterior of the building, they saw the lights were on in one of the apartments and a tall black male who appeared to be very interested in what the officers were doing was looking out the window. The officers noticed the man appeared to match the descriptions of the suspects and quickly ducked out of sight when he saw the officers look up at him. The officers decided to approach the apartment. When they

arrived at the front door to the apartment, they noticed someone had turned the lights off inside. As they stood outside the apartment door, they heard it lock from the inside. Officer Smithey then knocked on the door and announced the officers' presence.

A tall black male named Wesley Turner answered the door. The officers explained why they were there, and Turner allowed them inside. The officers entered the living room where they encountered Turner's girlfriend, Alyssa Miller, who also lived in the apartment. Turner and Miller indicated the only other person in the apartment was their roommate, Gunner Olson. Turner told the officers Olson was asleep in his room but agreed to wake him so the officers could speak with him. After Turner knocked on the bedroom door, Olson, who was also a black male, emerged from his room.

The officers decided to speak to the two men separately. Officer Stricker stepped outside to speak with Turner. During their brief conversation, Turner indicated he had remained in the apartment since arriving home from work around nine and had not seen anything suspicious.

Meanwhile, Officer Smithey stepped into the kitchen to speak with Olson. Olson confirmed he lived in the apartment along with Turner and Miller. Officer Smithey asked Olson if he could peek inside his bedroom. Only then did Olson tell Officer Smithey his cousin Marvis was sleeping in his bed. Olson told Officer Smithey that Marvis arrived sometime after he went to sleep earlier that evening. When asked, Olson indicated he did not know Marvis's last name and explained they were not really cousins. Officer Smithey did not ask Olson if Marvis had been staying in the apartment.

Olson then led Officer Smithey back to his bedroom. Officer Stricker looked on from the hallway, having just finished his conversation with Turner. Inside the room, the officers saw a shirtless black male in green pajama pants lying on the air mattress in the corner. The air mattress was the only mattress in the room. At the officers' request, Olson roused the man by shaking him, but the officers noticed that waking the man appeared to be considerably more difficult than it should have been. The officers also noticed the shirtless man was sweaty, which they thought odd because no one else in the apartment was sweating.

The man identified himself as Marvis Jackson. When asked if he had identification, Jackson indicated he did not. The officers had a brief conversation with Jackson, during which neither officer asked Jackson if he had been staying in the apartment, was an overnight guest, or had any personal belongings in the apartment. When the officers ran a check on Jackson's name, they discovered an outstanding warrant for his arrest for another armed robbery that took place at a gas station in November.[1] Officer Smithey notified Jackson he was under arrest, handcuffed him, and walked him out of the room. By that time, other officers had arrived at the apartment. Officer Smithey passed Jackson off to another officer for transport before returning to the bedroom.

While Officer Smithey was outside the bedroom passing Jackson off for transport, Officer Stricker spoke to Olson. Olson again indicated Jackson had arrived earlier that night after he had gone to sleep. Officer

---

[1]The court issued the arrest warrant after the owner received a tip that a man named "Juicy" had robbed the gas station and the detective in charge of the investigation learned from multiple sources Jackson went by the nickname "Juicy Jackson."

Stricker did not ask Olson if Jackson had been staying in the apartment, but Olson clearly indicated Jackson did not permanently reside in his bedroom. When asked if there were any guns in the room, he replied oddly that there should not be or that he did not know of any.

Officer Stricker then asked to search the bedroom for guns or any evidence of the robbery, and Olson consented to the search. Officer Stricker waited for Officer Smithey to return to the room. When Officer Smithey arrived, Officer Stricker informed him that Olson had consented to the search, and Olson confirmed he did not mind if Officer Smithey conducted the search. Neither officer asked Olson whether any of the items in the room might belong to Jackson. Officer Stricker then stepped outside the room with Olson to accompany him to the kitchen to get a glass of water.

Officer Smithey began searching Olson's room. He first searched the area around the air mattress. He searched under the sheets and blankets on top of the air mattress and then under the mattress itself. He then grabbed a backpack sitting a few feet away on the floor along the wall next to or partly inside the closet door, which was partially off its hinges. He placed the backpack on the chair sitting between the closet and the air mattress. The backpack was closed and had no obvious identifying marks or tags on its exterior indicating who owned it. Officer Smithey opened the backpack. He reached inside and located a wallet, which he removed and laid on the chair without opening it. When Officer Smithey reached inside a second time, he located a pair of dark jeans. He noticed the jeans were wet at the hem along the bottom of each leg, which led him to believe they had recently been worn outside in the snow. He then removed the jeans from the backpack. Underneath the jeans, Officer Smithey saw a black handgun.

After removing the jeans and locating the handgun, Officer Smithey stopped removing items from the backpack. He opened the wallet he had placed on the chair a few moments before and saw that it contained identification belonging to Marvis Jackson. Officer Smithey took a photograph of the handgun inside the backpack to use in an application for a search warrant. He then emerged from the bedroom and informed the sergeant who was the supervising officer on the scene it was time to lock down the apartment. The officers conducted a protective sweep of the apartment and transported Olson, Turner, and Miller to the station for questioning.

Back at the station, Officer Smithey completed a statement in support of an application for a search warrant. Detectives spoke with Miller, Turner, Olson, and Jackson in a series of interviews conducted between approximately 2:49 a.m. and 6:00 a.m. Turner admitted to committing the armed robbery of the restaurant, and Olson admitted to cutting up a t-shirt to provide Turner and Jackson with the strips of fabric they used to cover their faces during the robbery. After being informed the police had obtained confessions from Turner and Olson and retrieved a gun and cash from the apartment, Jackson also confessed to committing the restaurant robbery.

In the morning, the detective investigating the gas station robbery conducted a second round of interviews beginning after 7:00 a.m. During those interviews, the detective showed Turner and Miller photographs of the gas station robber captured by a security camera. Both Turner and Miller indicated the gas station robber looked like Jackson and recognized the shoes the robber was wearing. Turner also indicated Jackson had told him he had robbed a gas station, and Miller recognized the cap the robber was wearing and told the detective where it

could be found in the apartment. When the detective subsequently interviewed Jackson, he confessed to committing the gas station robbery.

During the interviews conducted throughout the night and in the morning, Miller, Turner, and Jackson all confirmed Jackson had been staying at the apartment for weeks prior to December 31 and acknowledged he had personal belongings in the apartment. When the police executed the search warrant on the apartment in the morning, they recovered $129 in one-dollar bills, $45 in five-dollar bills, and pieces of the t-shirt described by the men during their interviews the night before. The police also recovered a black Yankees cap matching the one worn by the gas station robber.

## II. Prior Proceedings.

The State charged Jackson with two counts of robbery in the second degree, including one count for the restaurant robbery and one count for the gas station robbery. *See* Iowa Code section 711.3 (2011). Jackson pled not guilty on both counts and filed a motion to suppress all evidence obtained as a result of the search of his backpack. In his motion to suppress, Jackson argued the warrantless search of his backpack was unreasonable and violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution and article I, section 8 of the Iowa Constitution because Olson had neither actual authority nor apparent authority to consent to the search of his backpack. Jackson further asserted the officers had a duty to inquire as to the ownership of the backpack before searching it because they had encountered an ambiguous situation that gave them reason to doubt whether Olson had authority to consent to a search of the backpack. The State resisted the motion.

Following a hearing, the district court denied the motion to suppress. Jackson thereafter waived his right to a jury trial and stipulated to a trial on the minutes of testimony. The district court found Jackson guilty of both counts of second-degree robbery and sentenced him to two concurrent indeterminate terms of incarceration not to exceed ten years with a mandatory minimum sentence of seven years of incarceration.

Jackson appealed, and we transferred the case to the court of appeals. The court of appeals concluded Olson had apparent authority, but not actual authority, to consent to the search of the backpack. The court of appeals allowed Jackson to pursue his ineffective-assistance-of-counsel claim in a postconviction relief proceeding because it determined his trial counsel had not preserved his argument that the Iowa Constitution requires consent from a person with actual authority to authorize a warrantless search.

Jackson filed an application for further review, which we granted.

**III. Issues.**

Jackson claims Officer Smithey violated his rights under the Fourth Amendment of the United States Constitution because Olson had neither actual authority nor apparent authority to consent to the search of his backpack. Alternatively, Jackson claims Officer Smithey violated his rights under article I, section 8 of the Iowa Constitution because Olson did not have actual authority to consent to the search of his backpack. Finally, Jackson claims that if the search did not violate the federal constitution, his trial counsel was constitutionally ineffective for failing to argue a different standard determines the constitutionality of warrantless searches authorized by consent under the state constitution.

**IV. Standard of Review.**

Jackson raises constitutional issues in this appeal. We review constitutional issues de novo. *State v. Kooima*, 833 N.W.2d 202, 205 (Iowa 2013).

**V. The Federal Doctrine of Consent by Apparent Authority.**

The Fourth Amendment of the United States Constitution provides,

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

A warrantless search violates the Fourth Amendment unless a warrant was not required to authorize it. *See State v. Nitcher*, 720 N.W.2d 547, 554 (Iowa 2006). The State bears the burden of proving by a preponderance of the evidence that a warrant was not needed to authorize a warrantless search. *See id.* In determining whether the State has met this burden, we use an objective standard to assess the conduct of the officer who performed the search. *Id.*

Under the Fourth Amendment, a warrant is not required to authorize a search performed pursuant to voluntary consent. *State v. Pals*, 805 N.W.2d 767, 777–82 (Iowa 2011).[2] An officer may rely on third-party consent to authorize a warrantless search so long as the circumstances indicate the third party had actual authority to consent to a search of the location searched. *See, e.g., State v. Campbell*, 326

---

[2]We have not determined whether voluntary consent authorizes a warrantless search under article I, section 8 of the Iowa Constitution, or whether article I, section 8 requires a knowing and intelligent waiver of rights to authorize a warrantless search. *See Pals*, 805 N.W.2d at 782.

N.W.2d 350, 352 (Iowa 1982); *State v. Folkens*, 281 N.W.2d 1, 3–4 (Iowa 1979). To establish a third party had actual authority to consent to a search, the government may show the third party "possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." *Campbell*, 326 N.W.2d at 352 (quoting *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993, 39 L. Ed. 2d 242, 250 (1974)). Common authority to consent to a search derives from "mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n.7, 94 S. Ct. at 993 n.7, 39 L. Ed. 2d at 250 n.7; *see State v. Bakker*, 262 N.W.2d 538, 546 (Iowa 1978).

Under the Fourth Amendment, an officer may also rely on third-party consent to authorize a warrantless search based on the third party's apparent authority to consent to the search. *State v. Lowe*, 812 N.W.2d 554, 576 (Iowa 2012). The doctrine of consent by apparent authority allows the government to demonstrate an officer who conducted a warrantless search was authorized to do so because the officer "reasonably (though erroneously)" relied on the apparent authority of the person who consented to the search. *Id.* (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S. Ct. 2793, 2800, 111 L. Ed. 2d 148, 160 (1990)).

The State relies on the doctrine of consent by apparent authority to justify the officer's warrantless search of the backpack found in the bedroom. The doctrine has its genesis in the United States Supreme Court's decision in *Illinois v. Rodriguez*, 497 U.S. 177, 110 S. Ct. 2793, 111 L. Ed.2d 148. In that case, an assault victim accompanied police officers to the defendant's apartment, unlocked the door with a key she had, and let the officers into the apartment. *Id.* at 179–80, 110 S. Ct. at

2796–97, 111 L. Ed. 2d at 155–56. The officers did not have an arrest warrant for the defendant or a search warrant to search the apartment. *Id.* at 180, 110 S. Ct. at 2797, 111 L. Ed. 2d at 155–56. As the officers moved through the premises, they observed drug paraphernalia and containers filled with white powder later determined to be cocaine in plain view in the living room. *Id.* at 180, 110 S. Ct. at 2797, 111 L. Ed. 2d at 156. They found additional containers filled with cocaine in two open attaché cases in the bedroom. *Id.* After the officers arrested the defendant on drug charges, he moved to suppress the evidence seized at the time of his arrest on the ground that the victim no longer lived in the apartment and therefore had no authority to consent to the entry and the search. *Id.*

The Supreme Court determined the State failed to prove the victim had common authority over the premises to consent to the search. *Id.* at 181–82, 110 S. Ct. at 2797–98, 111 L. Ed. 2d at 156–57. This was not, however, the end of the Court's inquiry. The Court stated the question of whether the officers violated the Fourth Amendment turned on an objective factual determination as to whether the officers reasonably believed the woman had authority to consent to the entry. *See id.* at 188, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161. The Court thus concluded a warrantless search conducted pursuant to consent by a third party does not violate the Fourth Amendment so long as the facts available to the officers at the moment it occurred would " 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises." *Id.* at 188–89, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161 (quoting *Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889, 906 (1968)). "If not," the Court explained, "then

warrantless entry without further inquiry is unlawful unless authority actually exists." *Id.*

In concluding searches conducted pursuant to consent by apparent authority satisfy the Fourth Amendment, the Court reasoned the Fourth Amendment requires law enforcement to make reasonable, not perfect, factual determinations concerning the scope of authority possessed by a person who consents to a search:

> It is apparent that in order to satisfy the "reasonableness" requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government . . . is not that they always be correct, but that they always be reasonable. . . .
>
> We see no reason to depart from this general rule with respect to facts bearing upon the authority to consent to a search. Whether the basis for such authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgment; and all the Fourth Amendment requires is that they answer it reasonably. The Constitution is no more violated when officers enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry is a resident of the premises, than it is violated when they enter without a warrant because they reasonably (though erroneously) believe they are in pursuit of a violent felon who is about to escape.

*Id.* at 185–86, 110 S. Ct. at 2800, 111 L. Ed. 2d at 159–60.

However, the Court cautioned that apparent authority does not necessarily exist merely because a person explicitly asserts a factual basis suggesting he or she has authority to consent. *Id.* at 188, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161. Rather, a person could make such an assertion and "the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry," in which case "warrantless entry without further inquiry" would be unlawful unless the consenting party had

actual authority. *Id.* at 188–89, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161. Thus, the Court emphasized courts must use an objective standard to determine whether apparent authority exists. *Id.* at 188, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161. In addition, the Court acknowledged the government bears the burden of establishing the effectiveness of third-party consent. *Id.* at 181, 110 S. Ct. at 2797, 111 L. Ed. 2d at 156. The Court remanded the case for a determination as to whether the officers reasonably relied on apparent authority to authorize their entry into the apartment because the appellate court had not determined whether officers had reasonably believed the victim had authority to consent. *Id.* at 189, 110 S. Ct. 2801, 111 L. Ed. 2d at 161.

*Rodriguez* involved a circumstance in which officers discovered evidence in plain view after they entered a home without a warrant based on consent given by a person who lacked actual authority to consent to a search of the home. In contrast, this case requires us to consider how the doctrine of consent by apparent authority applies to a closed container found inside a home searched by officers relying on consent given by a person who had actual authority to consent to the search of the home but lacked actual authority to consent to a search of the container. The Supreme Court has yet to apply the doctrine of consent by apparent authority to a closed container found within a home under these circumstances. Nor is there agreement among the federal circuit courts of appeal concerning how the apparent-authority doctrine applies under such circumstances. *See, e.g., United States v. Taylor,* 600 F.3d 678, 685 (6th Cir. 2010); *United States v. Snype,* 441 F.3d 119, 136–37 (2d Cir. 2006); *United States v. Waller,* 426 F.3d 838, 847–49 (6th Cir. 2005); *United States v. Melgar,* 227 F.3d 1038, 1041–42 (7th Cir. 2000); *United States v. Salinas-Cano,* 959 F.2d 861, 865–66 (10th Cir. 1992).

**A. Circuits Concluding Officers Have a Duty to Inquire Before Searching a Closed Container if a Reasonable Officer Would Conclude the Authority of the Person Who Consented to a Premises Search is Ambiguous.** The Tenth Circuit applied the apparent-authority doctrine in the context of a closed-container search in *United States v. Salinas-Cano*. After officers arrested the defendant following a drug buy, they asked his girlfriend for permission to search her apartment and indicated they were specifically interested in the defendant's possessions. *Salinas-Cano*, 959 F.2d at 862. She consented and led the officers to the area of the apartment where the defendant kept his belongings. *Id.* The officers opened a closed suitcase belonging to the defendant and found cocaine inside. *Id.* The district court denied the defendant's motion to suppress the evidence, and the defendant appealed. *Id.* at 863.

The Tenth Circuit reversed, emphasizing the government bears the burden of proving the effectiveness of third-party consent. *Id.* at 862, 864. The court concluded the government cannot meet this burden when officers faced with an ambiguous situation concerning the authority of the consenting party proceed to search without making further inquiry. *Id.* at 864. The court determined a warrantless search is unlawful without further inquiry "if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent." *See id.* (quoting *United States v. Whitfield*, 939 F.2d 1071, 1075 (D.C. Cir. 1991)). The court reasoned that under *Rodriguez*, apparent authority exists only in "situations in which an officer would have had valid consent to search *if the facts were as he reasonably believed them to be*." *Id.* at 865 (quoting *Whitfield*, 939 F.2d at 1074). The court therefore concluded the officer's subjective belief that the girlfriend had authority to consent to a search of the suitcase

was insufficient to legitimize the search under the apparent-authority doctrine. *Id.* at 866.

> It is not enough for the officer to testify, as he did here, that he *thought* the consenting party had joint access and control. The "apparent authority" doctrine does not empower the police to legitimize a search merely by the incantation of the phrase.

*Id.* at 865 (citation omitted).

Based on *Rodriguez*, the Tenth Circuit concluded proper analysis of apparent authority "rests entirely on the *reasonableness* of the officer's belief" that the consenting party had common authority over the container searched. *See id.* The officers had not asked any question that would have permitted them to determine whether the defendant's girlfriend had mutual use of his suitcase and authority to consent to a search of it. *Id.* at 866. Therefore, because the information known to the officers was insufficient to support a reasonable belief that the girlfriend had actual authority to consent to a search of the defendant's suitcase, the court concluded she did not have apparent authority to consent to the search. *See id.* According to the court, "To hold that an officer may reasonably find authority to consent solely on the basis of the presence of a suitcase in the home of another would render meaningless the Fourth Amendment's protection of such suitcases." *Id.*

The Tenth Circuit subsequently confirmed officers have a "duty to investigate" when it is ambiguous whether the person who consents to a premises search has authority over the location to be searched before conducting a warrantless search of a closed container:

> Importantly, "where an officer is presented with ambiguous facts related to authority, he or she has a duty to investigate further before relying on the consent." Thus, the government cannot meet its burden of demonstrating a third party's apparent authority "if agents, faced with an

ambiguous situation, nevertheless proceed without making further inquiry."

*United States v. Cos*, 498 F.3d 1115, 1128 (10th Cir. 2007) (citations omitted) (quoting *United States v. Kimoana*, 383 F.3d 1215, 1222 (10th Cir. 2004)).

The Sixth Circuit Court of Appeals analyzed whether a third party had apparent authority to consent to a search of a closed container in a similar manner in *United States v. Waller*. In *Waller*, officers arrested the defendant in the parking lot of an apartment complex where his friend was a tenant. 426 F.3d at 842. After the officers secured the defendant and proceeded to the apartment, the tenant told them the defendant had been storing some property there. *Id.* The tenant consented to a search of the apartment. *Id.* During the search, the officers opened a closed luggage bag they found in a bedroom closet and discovered a firearm. *Id.* The officers asked the tenant and his girlfriend whether the luggage bag or the firearm belonged to either of them. *Id.* Both individuals denied ownership of both the bag and the firearm. *Id.* The defendant appealed his conviction for being a felon in possession of a firearm. *Id.* at 843. He argued the district court erred in denying his motion to suppress the firearm evidence by ruling the officers had actual or apparent authority to search the luggage bag. *Id.*

After determining the tenant lacked common authority over the luggage bag, the Sixth Circuit considered whether the tenant had apparent authority to consent to the search of the bag. *Id.* at 844–46. The court summarized the doctrine of consent by apparent authority established in *Rodriguez* as follows:

> "When one person consents to a search of property owned by another, the consent is valid if 'the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority

over the premises.'" Whether the facts presented at the time of the search would "warrant a man of reasonable caution" to believe the third party has common authority over the property depends upon all of the surrounding circumstances. The government cannot establish that its agents reasonably relied upon a third party's apparent authority "if agents, faced with an ambiguous situation, nevertheless proceed without making further inquiry. If the agents do not learn enough, if the circumstances make it unclear whether the property about to be searched is subject to 'mutual use' by the person giving consent, 'then warrantless entry is unlawful without further inquiry.'" Where the circumstances presented would cause a person of reasonable caution to question whether the third party has mutual use of the property, "warrantless entry without further inquiry is unlawful[.]"

*Id.* at 846 (alteration in original) (citations omitted) (first quoting *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996); then quoting *Rodriguez*, 497 U.S. at 188, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161; then quoting *United States v. McCoy*, Nos. 97–6485, 97–6486, 97–6488, 1999 WL 357749, at *10 (6th Cir. May 12, 1999); and then quoting *Rodriguez*, 497 U.S. at 188–89, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161).

The court thus concluded the search of the bag was unlawful because under the circumstances it was unclear to the officers whether the tenant had common authority over it. *Id.* at 847, 849. Based on the facts known to the officers, the court concluded a reasonable officer would have found ambiguity existed with respect to the ownership of the bag and thus with respect to the question of common authority. *Id.* at 849.

In arriving at this conclusion, the Sixth Circuit reasoned that in the context of a closed container, the existence of common authority to consent derives from "mutual use of the property by persons generally having joint access or control for most purposes." *Id.* at 845, 848–49 (quoting *Matlock*, 415 U.S. at 171 n.7, 94 S. Ct. at 993 n.7, 39 L. Ed. 2d

at 250 n.7). Thus, the court emphasized that although officers might have believed the tenant had some level of control over the bag, in light of what the government would have had to prove to establish the tenant had common authority to consent to a search of it, a reasonable officer would have been "on notice of his obligation to make further inquiry prior to conducting a search." *Id.* at 848–49. In concluding the circumstances were sufficiently ambiguous to place a reasonable officer on notice that the tenant might not have had authority to consent to the search, the court found both the context of the search and its purpose to be relevant:

> The facts in this case are clear: the police never expressed an interest in [the tenant's] belongings in [the tenant's] apartment. The very purpose of the police presence was to search for (presumably) illegal possessions of [the defendant's]. Why would the police open the suitcase if they reasonably believed it belonged to [the tenant]? The answer is that they would not have opened the bag. They opened the bag precisely because they believed it likely belonged to [the defendant]. The police knew [the defendant] was storing belongings at the [the tenant's] apartment. Most people do not keep a packed, closed suitcase in their own apartment. Deliberate ignorance of conclusive ownership of the suitcase does not excuse the warrantless search of the suitcase, especially when actual ownership could easily have been confirmed.

*Id.* at 849 (emphasis omitted).

The Sixth Circuit concluded the district court erred in denying the defendant's motion to suppress and reversed his conviction. *See id.* It did so because the officers failed to make inquiry before searching the bag despite being on notice the tenant might not have had authority to consent to a search of it. *Id.* at 848–49. The court thus concluded an officer has a duty to inquire before relying on consent in circumstances in which the authority of the consenting person is ambiguous. *Id.* at 846–47. The court stressed its conclusion was consistent with the

Supreme Court's decision in *Rodriguez* and decisions by other courts to consider such circumstances. *Id.* (citing cases).

The Sixth Circuit revisited this issue in *United States v. Taylor*. There, officers arrested the male defendant in the apartment of his childless female friend. *Taylor*, 600 F.3d at 679, 682. The officers then asked the defendant's friend for permission to search her apartment, which she granted. *Id.* at 679. When the officers conducted the search, they found a closed shoebox for a pair of men's basketball shoes partially covered by men's clothes in the closet of a spare bedroom containing men's clothes, children's clothes, and children's toys. *Id.* Though the defendant's friend lived alone in the apartment, the officers made no inquiry to determine whether she had authority to consent to a search of the closed shoebox before opening it. *Id.* Inside the shoebox, they found a handgun and ammunition belonging to the defendant. *Id.* at 680. The government charged the defendant with being a felon in possession of a firearm and ammunition. *Id.* The district court granted the defendant's motion to suppress the evidence, finding the defendant's friend had neither common authority nor apparent authority to consent to the search of the shoebox. *Id.*

The Sixth Circuit affirmed the district court decision granting the defendant's motion to suppress. *Id.* at 679. In doing so, the court acknowledged the officers might have begun the search with a reasonable belief that everything in the apartment was subject to mutual use by its sole tenant. *Id.* at 681. But the court concluded "a reasonable person would have had substantial doubts about whether the box was subject to mutual use" by the tenant based on both the location where it was found and the label indicating it was for a pair of men's shoes. *Id.* at 682. The court stated its conclusion was reinforced by the fact the

district court found the officers likely would not have opened the shoebox if they had believed it belonged to the tenant, rather than the defendant. *Id.*

**B.    Circuits Concluding the Defendant Bears the Burden of Demonstrating Officers Had Reason to Question the Authority of the Person Who Consented to a Premises Search.**    The Seventh Circuit considered apparent authority in the context of a closed-container search in *United States v. Melgar*.    In *Melgar*, officers investigating the passing of counterfeit checks obtained consent to search a motel room from the woman who had rented it.    227 F.3d at 1039–41.    While conducting a search of the room, the officers found a purse with no identifying marks under the mattress of one of the beds.    *Id.* at 1040.    Though the officers knew several other women were staying in the room, they opened the purse without asking any questions to determine whether it belonged to the woman who rented the room.    *See id.* at 1039–40.    Inside, they discovered counterfeit checks and a fake identification bearing a photograph of the defendant, who was also staying in the room but had not consented to the search.    *Id.* at 1040.    The defendant challenged the district court's denial of her motion to suppress the evidence found inside the purse.    *Id.*

The Seventh Circuit concluded that because the police had no reason to know the woman who consented to the search of the room could not consent to a search of the purse, the district court correctly denied the defendant's motion to suppress.    *Id.* at 1041.    The court rejected the defendant's argument the officers should have inquired as to the owner of the purse because they had matched the other purses in the room to the other women staying there.    *Id.* at 1040–41.

The Seventh Circuit acknowledged the lack of binding authority concerning the proper application of the apparent-authority doctrine to closed-container searches. *See id.* at 1041. However, the court framed the question presented as follows:

> In a sense, the real question for closed container searches is which way the risk of uncertainty should run. Is such a search permissible only if the police have positive knowledge that the closed container is also under the authority of the person who originally consented to the search . . . , or is it permissible if the police do *not* have reliable information that the container is *not* under the authorizer's control.

*Id.*

In concluding the district court correctly denied the defendant's motion to suppress, the Seventh Circuit invoked the general rule that consent to search a space generally extends to a container within it so long as "a reasonable officer would construe the consent to extend to the container" and precedents governing the searches of containers found in automobiles. *Id.* at 1041–42. The court thus concluded apparent authority exists so long as the officer who conducts a warrantless search pursuant to third-party consent has no reliable information indicating the consenting party has no control over the container being searched. *See id.* In other words, the court concluded an officer may reasonably construe a third party's consent to search a premises to extend to all closed containers within that premises unless the officer has "reliable information" indicating a particular container is not within the third party's control.[3] *See id.* at 1041.

---

[3]In cases decided both before and after *Melgar*, the Seventh Circuit expressly acknowledged officers have "a duty to inquire further as to a third party's authority to consent to a search" before searching a closed container when "the surrounding circumstances make that person's authority questionable." *United States v. Goins*, 437 F.3d 644, 648 (7th Cir. 2006); *Montville v. Lewis*, 87 F.3d 900, 903 (7th Cir. 1996). Although the court has acknowledged "officers have a duty to inquire further as to a

The Second Circuit came to a similar conclusion in *United States v. Snype*.  In that case, officers discovered the defendant on the floor in the bedroom of an apartment belonging to his friend's girlfriend.  *Snype*, 441 F.3d at 126–27.  After the officers arrested the defendant and removed him from the apartment, they obtained the girlfriend's consent to search it.  *Id.* at 127.  During the search, the officers opened a closed knapsack and a closed red plastic bag they found on the floor in the room from which they had just removed the defendant.  *Id.*  The knapsack and the bag were sitting next to an open teller's box filled with cash taken from the bank the defendant was accused of robbing.  *Id.*  The defendant appealed his conviction for conspiracy to commit bank robbery, arguing the district court improperly admitted the evidence found in the knapsack and the bag.  *Id.* at 125, 136.

The Second Circuit concluded the district court properly determined the voluntary consent of the host had authorized the warrantless search of the entire apartment and all items within it, including the knapsack and the bag belonging to the defendant.  *Id.* at 137.  The court dismissed as conclusory the defendant's argument that the officers "had no objectively reasonable basis for concluding" the tenant had any interest in the closed containers found beside him.  *See id.* at 136–37.  Although the court acknowledged the host's open-ended

---

third party's authority" in some circumstances, it emphasizes "that is only true when the circumstances make the authority questionable in the first place."  *United States v. Pineda-Buenaventura*, 622 F.3d 761, 777 (7th Cir. 2010).  To the extent these decisions seem inconsistent, that inconsistency may stem from the fact that the *Melgar* court concluded ambiguity concerning the authority of a third party exists only when an officer has "reliable information" a container is not within the control of the person who consents to a search.  *See Melgar*, 227 F.3d at 1041.  It is hard to see how ambiguity concerning who has authority over a container could exist only when an officer has "reliable information" concerning the answer to that very question.

consent could not authorize a search or seizure of items found within the apartment that "obviously belonged exclusively" to another person, it found the district court did not err in admitting the evidence found inside the knapsack and the red plastic bag. *Id.* at 137. Rather, the court concluded the search did not violate the Fourth Amendment because the defendant failed to adduce credible evidence demonstrating the knapsack and the bag "so obviously belonged exclusively to him that the officers could not reasonably rely" on the host's unrestricted consent to search the premises. *See id.* at 136–37.

**C. Determination of the Applicable Test.** Under *Rodriguez*, a warrantless search of a closed container conducted pursuant to consent by a third party does not violate the Fourth Amendment so long as the person who consented had actual or apparent authority to consent to the search. *See Rodriguez*, 497 U.S. at 188–89, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161 (quoting *Terry*, 392 U.S. at 21–22, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906). The dispute among the federal circuit courts of appeal concerns the question of who bears the burden of proving third-party consent did or did not authorize a container search when the third party had actual authority to consent to a search of a premises but lacked actual authority to consent to a search of a container on that premises. The Sixth and Tenth Circuits have concluded the government bears the burden of demonstrating the officer inquired before searching a closed container if the circumstances would have alerted a reasonable officer that the person who consented to a search of the premises might not have had authority to consent to a search of a closed container. *See Taylor*, 600 F.3d at 681; *Salinas-Cano*, 959 F.2d at 864. The Second and Seventh Circuits have concluded the defendant bears the burden of adducing evidence to show the officer could not have reasonably relied

on third-party consent so long as the third party had authority to consent to a search of the premises. *See Snype*, 441 F.3d at 136–37; *Melgar*, 227 F.3d at 1041. For the following reasons, we find the reasoning of the Sixth and Tenth Circuits to be more persuasive than the reasoning of the Second and Seventh Circuits.

First, we recognize a privacy interest in a closed container is not necessarily coextensive with a privacy interest in the surrounding location in which the container is located:

> A privacy interest in a home itself need not be coextensive with a privacy interest in the contents or movements of everything situated inside the home. This has been recognized before in connection with third-party consent to searches. A homeowner's consent to a search of the home may not be effective consent to a search of a closed object inside the home. Consent to search a container or a place is effective only when given by one with "common authority over or other sufficient relationship to the premises or effects sought to be inspected."

*United States v. Karo*, 468 U.S. 705, 725, 104 S. Ct. 3296, 3308, 82 L. Ed. 2d 530, 548 (1984) (O'Connor, J., concurring) (quoting *Matlock*, 415 U.S. at 171, 94 S. Ct. at 993, 39 L. Ed. 2d at 250). As the Indiana Supreme Court has pointed out, the *Melgar* court did not acknowledge third-party consent to search a premises may implicate privacy interests in a closed container that are distinct from those the third party had in the premises. *See Krise v. State*, 746 N.E.2d 957, 967–68 (Ind. 2001). We reject the notion that a guest assumes the risk the government might unreasonably intrude upon a privacy interest in a closed container merely by bringing the container into the home of another person. *See id.* As the United States Supreme Court has noted, "what is at issue when a claim of apparent consent is raised is not whether the right to be free of searches has been *waived*, but whether the right to be free of

*unreasonable* searches has been *violated.*" *Rodriguez*, 497 U.S. at 187, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161.

Second, both the Supreme Court and this court have recognized the home is entitled to special status in the Fourth Amendment context. *See Kyllo v. United States*, 533 U.S. 27, 31, 121 S. Ct. 2038, 2041, 150 L. Ed. 2d 94, 100 (2001); *State v. Ochoa*, 792 N.W.2d 260, 276–77, 287 (Iowa 2010). It does not square with the Fourth Amendment's recognition of the sanctity of the home to suggest bringing an object into a home might diminish, rather than enhance, a person's privacy interest in that object. *See Karo*, 468 U.S. at 717, 104 S. Ct. at 3304, 82 L. Ed. 2d at 542 (holding warrantless electronic monitoring of a beeper inside a drum brought inside a home violated the Fourth Amendment).

Third, when a defendant moves to suppress evidence obtained when an officer conducted a warrantless search, the State bears the burden of proving the search did not violate the Fourth Amendment. *Nitcher*, 720 N.W.2d at 554. The Supreme Court has indicated this burden remains with the government in the context of third-party consent. *Rodriguez*, 497 U.S. at 181, 110 S. Ct. at 2797, 111 L. Ed. 2d at 156. *Rodriguez* made clear the government may meet its burden of proving the effectiveness of third-party consent by two possible means. *Id.* at 181, 188–89, 110 S. Ct. at 2798, 2801, 111 L. Ed. 2d at 156, 161. First, the government may demonstrate the person consenting to the search had actual authority to consent to a search of the location searched. *Id.* at 181, 110 S. Ct. at 2798, 111 L. Ed. 2d at 156. Second, the government may demonstrate the facts available to the officer when the officer conducted the search would have warranted a person of reasonable caution in the belief that the person consenting had authority to consent to a search of the location searched. *Id.* at 188–89, 110 S. Ct.

at 2801, 111 L. Ed. 2d at 161. It would improperly reverse the burden of proof to require a defendant to *disprove* the effectiveness of the consent relied upon by officers who searched a closed container belonging to the defendant.

Finally, to flip the presumption of unreasonableness that generally applies to warrantless searches merely because a third party explicitly granted consent to a premises search would be inconsistent with *Rodriguez*. As the Supreme Court recognized in *Rodriguez*, even when a person makes an assertion he or she has authority to authorize a search, "the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." *Id.* at 188, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161.

The lesson of *Rodriguez* is that a warrantless search is not authorized when the circumstances would cause a reasonable officer to doubt whether the party consenting had authority to consent with respect to the location to be searched. The mere fact that an officer subjectively relied on third-party consent does not render that reliance reasonable. *See id.* at 188–89, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161. Reliance on apparent authority to authorize a search is only reasonable when the authority of the person consenting is actually apparent with respect to the location to be searched. Thus, when the totality of the circumstances indicates a reasonable officer would have conducted further inquiry to determine whether the person who consented to a premises search had authority to consent to a search of a closed container, the government must demonstrate the officer did just that in order to establish the search of the container was reasonable.

The government bears the burden of proving a warrantless search was reasonable. Therefore, in determining whether a warrantless search

of a container was reasonable based on the apparent authority of the consenting party, the relevant question is not whether the defendant has adduced enough evidence to prove an officer's reliance on third-party consent was unreasonable.[4]  Rather, the question is whether the government has proved by a preponderance of the evidence that circumstances existing when the container was searched would have warranted a person of reasonable caution in the belief that the person who consented to a search of the premises also had authority over the container.  *Waller*, 426 F.3d at 846 (quoting *Rodriguez*, 497 U.S. at 188, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161).

The government cannot demonstrate an officer reasonably relied on apparent authority to authorize a search if the officer proceeded without making further inquiry when faced with an ambiguity concerning the question of whether the container to be searched was subject to ownership or mutual use by the consenting party.  *See id.* at 846–47.  When an officer faced with such ambiguity searches a closed container without a warrant and without inquiring enough to clarify whether the person who consented to a premises search had authority to consent to a search of the container, the search is unlawful.  *See Rodriguez*, 497 U.S. at 188–89, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161; *Waller*, 426 F.3d at 846.

**D.  Analysis.**  As the district court noted, the State presented no evidence to indicate Olson had actual authority to consent to a search of Jackson's backpack.  In addition, the State conceded Jackson

---

[4]The defendant *may* prove it was unreasonable for an officer to rely on third-party consent by demonstrating the officer had reliable information indicating the consenting party lacked authority to consent to the search of a closed container or that it was obvious the container belonged exclusively to the defendant.  *Cf. Snype*, 441 F.3d at 136–37; *Melgar*, 227 F.3d at 1041.

maintained control over his backpack as a guest in Olson's bedroom. Thus, we must determine whether Olson had apparent authority to consent to the search of Jackson's backpack.

The first step in our analysis is to determine whether the State proved by a preponderance of the evidence the facts and circumstances known to the officers when Jackson's backpack was searched would have warranted a person of reasonable caution in the belief that Olson had authority over the backpack. If so, Officer Smithey reasonably relied on apparent authority to authorize the warrantless search without making further inquiry. To answer this question, we must consider whether a reasonable officer would have found Olson's authority to consent to a search of the backpack ambiguous based on the facts and circumstances known to the officers. *See Waller*, 426 F.3d at 847.

The evidence shows the officers knew the following facts when Officer Smithey conducted the search of the closed backpack. The officers initiated contact with the occupants of the apartment because they saw a black male observing them from the window and suspected he was involved in the robbery. The officers had just responded to a call about a robbery allegedly committed by two black males and followed footprints in the snow to the building in which the apartment was located. They were not responding to a call originating inside the apartment. When the officers knocked on the front door, it was nearly 1:00 a.m. After Turner answered the door and let the officers inside, Turner and Miller told the officers they lived in the apartment with their roommate, Olson.

Turner and Miller indicated Olson was the only other person present in the apartment, but that turned out to be untrue. When Officer Smithey asked Olson if he could peek inside his bedroom, Olson

acknowledged Jackson was asleep in his bed. Olson told the officers Jackson was not in the apartment when he went to sleep and he awoke to discover Jackson sleeping beside him, but he did not suggest he was alarmed to discover Jackson in his bed. No one suggested to the officers that Jackson had broken into the apartment or had recently arrived, and no one indicated anything suspicious had occurred that evening. Rather, Turner indicated he had been home since approximately 9:00 p.m. and nothing suspicious had occurred since that time. The officers did not ask Turner, Miller, or Olson if Jackson was staying in the apartment or if he had any belongings there. Although the officers noticed Jackson was sweaty and difficult to rouse from slumber, they found him to be cooperative once he was awake.

Before Officer Smithey informed Jackson of the outstanding warrant for his arrest and escorted him from the room, the officers did not ask him if he was staying in the apartment or had any belongings there. When the officers later asked Olson if there were any guns in his bedroom, he responded that there should not be or there were not any that he knew of. Olson then consented to a search of the room for guns or evidence of the robbery, but neither officer asked whether he owned the backpack or confirmed that everything in the room belonged to him. The backpack was sitting a few feet from the bed where Jackson had just been sleeping along the wall next to or partly inside the closet door, which was partially off its hinges.

We conclude the circumstances existing when Officer Smithey conducted the search of the backpack would cause a person of reasonable caution to question whether the backpack belonged to Jackson or Olson and whether it was subject to mutual use by Olson. *See id.* at 849. First, although no one in the apartment referred to

Jackson as an overnight guest, the circumstances clearly suggested Jackson was an overnight guest. When the officers arrived at the apartment in the middle of the night, Jackson appeared to be asleep in a bed. Olson stated he was not sure when Jackson arrived, but he was not alarmed when he awoke to discover Jackson partially clothed beside him in bed. Obviously Olson and Jackson were familiar enough that Jackson's presence in Olson's room late at night was not an unusual occurrence. In fact, there was reason to believe Jackson had a key to the apartment because Turner and Miller did not appear to know Jackson was in the apartment and Olson indicated Jackson arrived when he was asleep. In other words, the information available to the officers suggested Jackson arrived at the apartment when no one was home sometime after Olson went to sleep but before Turner arrived home from work.

Second, the circumstances known to the officers were sufficient to alert them to the fact that Jackson had clothes other than the pajama pants he was wearing at the apartment. The officers knew it was cold enough outside that Jackson probably had some sort of warmer apparel at the apartment, as there was fresh snow on the ground and they had followed footprints in the snow to the apartment building. The floor plan of the apartment was such that Jackson would have had to enter it from outdoors.

Third, the circumstances indicated it was likely the clothes Jackson was wearing when he arrived at the apartment were in Olson's bedroom. Jackson was asleep on the bed in Olson's bedroom wearing pajama pants when the officers arrived. Yet the statements Turner and Miller made to the officers indicated they did not know Jackson was in the apartment. Had Jackson changed into the pajama pants in the

bathroom, kitchen, or living room and left his clothes there, Turner and Miller likely would have seen them and known Jackson was in the apartment. Thus, the fact that Turner and Miller did not know Jackson was in the apartment suggested he either changed into the pajama pants in Olson's room or moved his clothes to Olson's room after putting the pajama pants on. Moreover, a backpack is the sort of container a person staying overnight in a place other than his or her home might use to hold clothing and other personal items.

Fourth, the statements Olson made suggested he knew there were items in his bedroom that did not belong to him. Olson did not answer definitively when asked whether there was a gun in the room. Had everything in the room that could conceal a gun belonged to Olson, he could have stated with certainty that there was no gun in the room. Instead, Olson waffled. His uncertainty in response to a direct question suggested he knew there were items in the room that did not belong to him and knew that one of those items might be a container concealing a gun from plain view.

Faced with these circumstances, we conclude a reasonable officer would have doubted whether Jackson owned the backpack and questioned whether Olson had authority to consent to a search of it. *See id.* at 848. The State does not dispute the officers made no inquiry concerning who owned the backpack before Officer Smithey searched it. Nor does the State suggest either officer ever asked anyone whether Jackson was staying in the apartment or had any personal belongings there. Had the officers asked questions intended to clarify whether Olson had authority to consent to the search of the backpack, Officer Smithey might have reasonably relied on the answers the officers received to proceed with a warrantless search based on Olson's apparent

authority to consent. However, the officers asked no questions to clarify who owned or used the backpack before Officer Smithey searched it even though the circumstances indicated Olson's authority to consent to a search of the backpack was ambiguous. Because the officers asked no such questions, Officer Smithey's reliance on Olson's consent to a search of his room to authorize a warrantless search of the backpack was unreasonable. In short, because the circumstances were unclear and the officers sought no clarification, Officer Smithey could not reasonably rely on apparent authority to authorize a warrantless search of the backpack.

The district court concluded the officers might have reasonably believed Jackson likely ran to the apartment after the robbery and feigned sleep. We do not disagree. However, the circumstances also suggested Jackson was either an overnight guest or staying in the apartment. The fact the officers might have reasonably thought one of these scenarios was more likely than the other does not eliminate the fact the circumstances were ambiguous. Moreover, if Officer Smithey reasonably believed Jackson was one of the restaurant robbers when he searched the backpack, that suggests he did not reasonably believe Olson had authority over the backpack when he searched it. If the very purpose of the search was to find evidence linking Jackson to the robbery, Officer Smithey would have had no motivation to open the closed backpack unless he believed it might have belonged to Jackson. *See id.* at 849.

Finally, we note apparent authority is only a lawful basis for a search in "situations in which an officer would have had valid consent to search *if the facts were as he reasonably believed them to be.*" *Salinas-Cano,* 959 F.2d at 865 (quoting *Whitfield,* 939 F.2d at 1074). Thus, even

if Officer Smithey reasonably believed Jackson had just arrived in the apartment, he could only reasonably rely on apparent authority to justify the search of the backpack *so long as* he reasonably believed Olson owned it. In light of the facts known to the officers when Officer Smithey opened the backpack, after realizing it contained a wallet and clothing recently worn outside, a reasonable officer would have been on notice that the backpack might not belong to Olson.

Nonetheless, when Officer Smithey removed the wallet from the backpack, he initially declined to open it. Instead, he reached into the backpack again, felt the wet hem on the jeans, and realized they had just been worn outside in the snow. At that point, if not before, a reasonable officer would have suspected the backpack likely belonged to Jackson. However, instead of stopping the search, Officer Smithey removed the jeans from the backpack and saw the gun beneath them. Only then did he open the wallet to confirm his suspicion that Jackson owned the backpack. The fact that he did so confirms he recognized it was unclear who owned the backpack by the time he removed the jeans from within it. Because Officer Smithey could not have reasonably believed it was certain that Olson owned the backpack, yet declined to open the wallet sooner despite the ambiguous circumstances, his continued reliance on Olson's consent to authorize the warrantless search was unreasonable.

Because we conclude the circumstances were sufficiently ambiguous to place a reasonable officer on notice of his obligation to make inquiry as to who had authority to consent to a search of the closed backpack prior to searching it, we conclude the warrantless search of the backpack was unlawful under the Fourth Amendment. *See Waller*, 426 F.3d at 849. Thus, the district court erred in failing to suppress the evidence found in the backpack and the fruits of the

unlawful search.  *See Wong Sun v. United States*, 371 U.S. 471, 484–85, 83 S. Ct. 407, 415–16, 9 L. Ed. 2d 441, 453–54 (1963).

## VI.  The Defendant's Claim Under the Iowa Constitution.

Jackson also claims the State violated his rights under article I, section 8 of the Iowa Constitution.  Article I, section 8 of the Iowa Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated."  Iowa Const. art. I, § 8.

We jealously guard our right to construe a provision of our state constitution differently than its federal counterpart, though the two provisions may contain nearly identical language and have the same general scope, import, and purpose.  *Kooima*, 833 N.W.2d at 206; *see Varnum v. Brien*, 763 N.W.2d 862, 878 n.6 (Iowa 2009).  We also reserve our right to independently apply a federal standard more stringently than federal caselaw when construing the requirements of our state constitution, whether or not a party has advanced a different standard applies under the state constitution.  *Kooima*, 833 N.W.2d at 206; *see Varnum*, 763 N.W.2d at 879 n.6.

However, because we conclude the warrantless search violated the federal constitution, we need not decide whether independent analysis or a more stringent application of the federal standard governing warrantless searches is required under our state constitution.  *See Ochoa*, 792 N.W.2d at 267; *cf. Racing Ass'n of Cent. Iowa v. Fitzgerald*, 675 N.W.2d 1, 4–7 (Iowa 2004) (describing this court's obligation to independently evaluate constitutionality under our state constitution when conduct does not violate the federal constitution).  Thus, we do not consider whether a warrantless search is valid under our state

constitution when the individual who consented to a search of a premises had apparent authority, but not actual authority, to consent to a search of a closed container on that premises. *See, e.g.*, *State v. Lopez*, 896 P.2d 889, 903 (Haw. 1995); *State v. McLees*, 994 P.2d 683, 690–91 (Mont. 2000); *State v. Wright*, 893 P.2d 455, 460–61 (N.M. Ct. App. 1995); *State v. Will*, 885 P.2d 715, 719–20 (Or. Ct. App. 1994). Nor do we consider whether Jackson's trial counsel was constitutionally ineffective for failing to argue the state constitution permits a warrantless search of a closed container based on consent to a premises search only when the person who consented to the premises search had actual authority to consent to a search of the closed container.

## VII. Disposition.

Because the State failed to prove Olson had apparent authority to consent to a search of Jackson's backpack, we conclude the warrantless search was unlawful under the Fourth Amendment of the United States Constitution without further inquiry. Because the district court erred in denying Jackson's motion to suppress the evidence found in the backpack and the fruits of the unlawful search, we vacate the decision of the court of appeals, reverse the judgment of the district court, and remand the case for a new trial.

**DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED.**

All justices concur except Appel, J., who concurs specially, and Zager, Waterman, and Mansfield, JJ., who dissent.

**APPEL, Justice (concurring specially).**

I concur in the majority opinion. I would base the decision in this case, however, on article I, section 8 of the Iowa Constitution.

First, article I, section 1 declares that men and women have certain "inalienable rights," among those being "enjoying and defending life and liberty . . . ." The general declaration of inalienable rights is given further definition in article I, section 8 of the Iowa Constitution, which provides,

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

The constitutional focus of article I, section 8 is on protecting *personal, inalienable* rights at the very heart of freedom, the right to be secure in one's home and personal effects from unwarranted government invasions. *See State v. Young*, 863 N.W.2d 249, 278 (Iowa 2015) ("The bill of rights of the Iowa Constitution embraces the notion of 'inalienable rights' . . . ."); *State v. Short*, 851 N.W.2d 474, 484 (Iowa 2014) (noting the role of article I, section 1 in this court's decision in *Coger v. Nw. Union Packet Co.*, 37 Iowa 145 (1873), which rejected the notion that African Americans could be subjected to different treatment in public transportation); Joseph R. Grodin, *Rediscovering the State Constitutional Right to Happiness and Safety*, 25 Hastings Const. L. Q. 1, 22 (1997) ("[M]ost courts have assumed that the inalienable rights clauses have some judicially enforceable content.").

Second, the United States Supreme Court, in recent innovations, has undercut its own previous recognition of the traditional and

fundamental concept that search and seizure protections are personal rights. In *Stoner v. California*, the Court declared that the right to be free from a warrantless search was "a right . . . which only the petitioner could waive . . . either directly or through an agent." 376 U.S. 483, 489, 84 S. Ct. 889, 893, 11 L. Ed. 2d 856, 860 (1964). Consistent with the personal-rights theory of search and seizure protections, after *Stoner*, the Court held that search and seizure rights are personal rights which cannot be asserted by a third party. *Rakas v. Illinois*, 439 U.S. 128, 133–34, 99 S. Ct. 421, 425, 58 L. Ed. 2d 387, 391 (1978). Although the Court significantly and unworkably undermined the concept of consent in *Schneckloth v. Bustamonte*, consent was still described as a situation "where a person foregoes a constitutional right." 412 U.S. 218, 245, 93 S. Ct. 2041, 2057, 36 L. Ed. 2d 854, 873 (1973).

The Court, however, upset the logic and balance of its prior consent cases in *Illinois v. Rodriguez*, 497 U.S. 177, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990). In *Rodriguez*, the Court abandoned its focus on the personal nature of search and seizure protections and instead developed a new test of consent based on the reasonableness of police conduct. *Id.* at 184, 110 S. Ct. at 2799, 111 L. Ed. 2d at 158; *see* Christo Lassiter, *Consent to Search by Ignorant People*, 39 Tex. Tech L. Rev. 1171, 1173 (2007) (characterizing *Rodriguez* as "a new approach").

This new approach to consent embraced by the Court in *Rodriguez* stands in strong contradiction to its prior caselaw. We should not embrace this new approach to consent under the Iowa Constitution, which protects inalienable rights, including those related to search and seizure in article I, section 8. We have rejected "socio-juristic rationalizations" or "dilution" theories in search and seizure law. *State v. Cullison*, 173 N.W.2d 533, 536 (Iowa 1970).

Third, while the United States Supreme Court in *Rodriguez* and other later cases has sought to shrink the warrant requirement through radiations emanating from a highly pliable reasonableness clause, we have declined to adopt this additional revision of traditional search and seizure law under article I, section 8 of the Iowa Constitution. Instead, we have reaffirmed the primacy of the warrant requirement. *See State v. Ochoa*, 792 N.W.2d 260, 269 (Iowa 2010).

We examined these developments at length in *State v. Short*, 851 N.W.2d 474. As noted in *Short*, our constitutional jurisprudence has long emphasized the primacy of the warrant requirement. *Id.* at 503. In *Short*, we reiterated the traditional view that the constitutional workhorse of the search and seizure protections under article I, section 8 is the warrant requirement. *Id.* at 506. As explained in *Short*, the warrant requirement mandates not only that searches be approved by a neutral magistrate, but equally importantly that the scope of the search be well defined and that probable cause exists to support it. *Id.* at 502–03. *Short* firmly rejected the view that a freestanding concept of "reasonableness . . . [was] the touchstone of search and seizure law." *Id.* at 501. We stated in *Short* that such an approach eviscerated the protections available under search and seizure law. *Id.* at 501–02.

There are, as recognized in *Short*, exceptions to the ordinarily required warrant based largely upon the impracticability of obtaining a warrant. *Id.* at 496–97. There is no claim in this case that the warrantless search here was supported by exigent circumstances or a search incident to arrest. The search is supported solely on the theory of consent. The question thus is whether the defendant here consented to forego the constitutional protections offered by the warrant requirement

under article I, section 8. If a person grants consent to a search or seizure, the protections of article I, section 8 are inapplicable.

Fourth, in evaluating consent, the sole focus is whether the individual has elected to forgo personal constitutional protections, thereby rendering constitutional limitations inapplicable. The focus should laser in on the only relevant constitutional issues: Did the defendant give consent, and was the consent voluntary or coerced?

We must thus separate the wheat from the chaff. Consent searches have nothing to do with the impracticability of obtaining a warrant. Impracticability is beside the point. Consent searches have nothing to do with the reasonability of police conduct. Otherwise, the personal search and seizure protections of article I, section 8 are turned upside down and subverted from providing personal protections into an enabling act allowing police to engage in warrantless searches without consent as long as the search meets some freewheeling post-hoc concept of reasonableness. *See* Thomas Y. Davies, *Denying a Right by Disregarding Doctrine: How* Illinois v. Rodriguez *Demeans Consent, Trivializes Fourth Amendment Reasonableness, and Exaggerates the Excusability of Police Error*, 59 Tenn. L. Rev. 1, 6 (1991) [hereinafter Davies].

Here, it is clear there was no actual consent. Further, it is undisputed that no third party had actual authority to give consent. Under article I, section 8, a warrant is thus required to conduct the search, unless some exception to the warrant requirement is present. Because the State does not claim any other basis to support the search, the results of the search are based on an unauthorized third-party consent and must be suppressed.

In this case, counsel for Jackson did not argue that article I, section 8 of the Iowa Constitution should be construed differently from its federal counterpart. In my view, Jackson received ineffective assistance of counsel because of his failure to raise the issue. As we have previously stated, defense lawyers must "take pains to guarantee that their training is adequate and their knowledge up-to-date in order to fulfill their duty as advocates." *State v. Vance,* 790 N.W.2d 775, 785 (Iowa 2010) (quoting ABA Standards for Criminal Justice: Prosecution Function and Defense Function 4-1.2(e) cmt., at 122–23 (3d ed. 1993)). Further, an effective attorney is one who "diligently devotes him or herself to scholarly study of the governing legal principles" implicated in a given case. *Id.* at 786 (quoting 16 Gregory C. Sisk & Mark S. Cady, *Iowa Practice Series: Lawyer and Judicial Ethics,* § 5:1(b), at 140 (2007)). A lawyer conforming to these standards would have been aware of the willingness of state courts, including Iowa's, to depart from United States Supreme Court precedent in the search and seizure area, of the caselaw from other jurisdictions where state supreme courts have declined to follow *Rodriguez,* and of the academic literature criticizing the consent doctrine adopted in *Rodriguez. See State v. Lopez,* 896 P.2d 899, 901–02 (Haw. 1995); *State v. McLees,* 994 P.2d 683, 691 (Mont. 2000); *State v. Wright,* 893 P.2d 455, 461 (N.M. Ct. App. 1995); *State v. Will,* 885 P.2d 715, 719 (Or. Ct. App. 1994); *State v. Morse,* 123 P.3d 832, 838 (Wash. 2005); Davies, 59 Tenn. L. Rev. at 8–10.

For the above reasons, I would thus hold that the search in this case is constitutionally infirm under article I, section 8 of the Iowa Constitution.

**ZAGER, Justice (dissenting).**

I respectfully dissent.

After thoroughly reviewing all of the evidence, the district court concluded that under the Fourth Amendment, Olson had apparent authority to consent to the search of the backpack located in his bedroom. I agree, and I would affirm the decision of the court of appeals and the judgment of the district court.

As a preliminary matter, I agree with the conclusion reached by the majority that this case can be decided under the Fourth Amendment to the United States Constitution and the cases cited therein. *See Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S. Ct. 2793, 2800, 111 L. Ed. 2d 148, 160 (1990). However, I also think it is important to recognize the standard of review that must be utilized. Our review in this case is de novo. *State v. Gaskins*, 866 N.W. 2d 1, 5 (Iowa 2015). "Because this case concerns the constitutional right to be free from unreasonable searches and seizures, our review of the district court's suppression ruling is de novo." *Id.* (quoting *State v. Watts*, 801 N.W.2d 845, 850 (Iowa 2011)). "We independently evaluate the totality of the circumstances found in the record, including the evidence introduced at both the suppression hearing and at trial." *Id.* (quoting *State v. Vance*, 790 N.W.2d 775, 780 (Iowa 2010)).

**I. General Search and Seizure Principles.**

The Fourth Amendment to the United States Constitution provides:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. Both the Fourth Amendment and article I, section 8 of the Iowa Constitution protect the right of individuals to be free from unreasonable searches and seizures. *Id.*; Iowa Const. art. I, § 8.

"Warrantless searches are per se unreasonable if they do not fall within one of the well-recognized exceptions to the warrant requirement." *State v. Tyler*, 867 N.W.2d 136, 169 (Iowa 2015) (quoting *State v. Lowe*, 812 N.W.2d 554, 568 (Iowa 2012)). Under the Fourth Amendment, a warrant is not required to authorize a search performed pursuant to voluntary consent. *See State v. Pals*, 805 N.W.2d 767, 777 (Iowa 2011). Likewise, we have recognized that an officer may rely on the consent of a third party to authorize a warrantless search, so long as the circumstances indicate the third party had actual authority to consent to a search of the location. *See, e.g., State v. Campbell*, 326 N.W.2d 350, 352 (Iowa 1982). The State has conceded that there was no actual authority for the third party—Olson—to consent to the search of the backpack.

## II. Apparent Authority to Consent to a Search.

Under the Fourth Amendment, a law enforcement officer is entitled to rely on the consent of a third party authorizing a warrantless search based on that third party's apparent authority to consent to the search in question. *Rodriguez*, 497 U.S. at 186, 110 S. Ct. at 2800, 111 L. Ed. 2d at 160. The Supreme Court has made it clear that under the Fourth Amendment, law enforcement officers may conduct a search based on the consent of a party who does not have actual authority over the property to be searched, so long as the officers reasonably (though erroneously) believe that the person who has consented to their entry had authority over the premises. *Id.* In *Rodriguez*, the Court concluded

a warrantless search conducted after obtaining the consent of a third party does not violate the Fourth Amendment so long as the facts available to the officers at the time of the search occurred would " 'warrant a man of reasonable caution in the belief' that the consenting party had authority over the premises." *Id.* at 188, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161 (quoting *Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S. Ct. 1868, 1880, 20 L. Ed. 2d 889, 906 (1968)). If not, "warrantless entry without further inquiry is unlawful unless authority actually exists." *Id.* at 188–89, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161. The Court cautioned that "surrounding circumstances could conceivably be such that a reasonable person would doubt [an individual's assertion of authority] and not act upon it without further inquiry." *Id.* at 188, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161. As such, we utilize an objective standard to determine whether apparent authority existed at the time of a warrantless search. *Id.*

We have adopted these doctrines through our own case law. *See, e.g.*, *Lowe*, 812 N.W.2d at 576. Relying on *Rodriguez*, we confirmed that the authority to consent includes not only actual authority, but also apparent authority. *Id.* We also confirmed that apparent authority validates a search when officers "enter without a warrant because they reasonably (though erroneously) believe that the person who has consented to their entry" had the authority to do so. *Id.* (quoting *Rodriguez*, 497 U.S. at 186, 110 S. Ct. at 2800, 111 L. Ed. 2d at 160). We apply an objective standard when analyzing consent and ask, "[W]ould the facts available to the officer at the moment . . . warrant a [person] of reasonable caution in the belief that the consenting party had authority over the premises?" *Id.* (second alteration in original) (quoting *Rodriguez*, 497 U.S. at 188, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161).

**A. Apparent Authority Applied to Closed Containers.** As the majority properly notes, the Supreme Court has yet to apply the doctrine of consent by a third party to the search of another's closed container under the theory of apparent authority. I also recognize that there is a split of authority as to the application of the doctrine among the federal circuit courts of appeal. However, what is clear is that any analysis of the doctrine is highly fact-specific. It is equally clear that it is only in those circumstances where ambiguity exists that it is reasonable to require that officers make further inquiry regarding the ownership of the closed container. "Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry." *Rodriguez,* at 188, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161. While acknowledging a split of authority, a review of various decisions of the United States Courts of Appeal confirms several conclusions. First, the facts in those cases are distinguishable from the facts presented here. Second, there is no ambiguity relating to the authority of Olson to consent to the search of the backpack in this case. Therefore, the law enforcement officers had no duty to make further inquiry before they searched the backpack.

1. *Tenth Circuit Court of Appeals.* In *United States v. Salinas-Cano,* the defendant was arrested following a controlled drug buy. 959 F.2d 861, 862 (10th Cir. 1992). After his arrest, police went to his girlfriend's apartment and asked her for permission to search. *Id.* The police told her they were specifically interested in Salinas-Cano's possessions. *Id.* She consented to the search and told the police where Salinas-Cano kept his belongings at her apartment. *Id.* The police opened what they had

just been advised was Salinas-Cano's closed but unlocked suitcase, where they discovered cocaine. *Id.*

In addition to the obvious differences between the facts of *Salinas-Cano* and the case presently before us, the legal arguments were also distinct. In *Salinas-Cano,* the government primarily relied on the concepts of actual authority, joint access, and control in arguing for the admissibility of the evidence. *See id.* at 863. The government also attempted to utilize the apparent authority doctrine because the officer testified he *thought* the consenting party—the girlfriend—had joint access and control. *Id.* at 865. As properly concluded by the court, apparent authority "does not empower the police to legitimize a search merely by the incantation of the phrase." *Id.* The analysis should instead rest entirely upon the reasonableness of the officer's belief in the apparent authority. *Id.*

There is no logical correlation between the facts in *Salinas-Cano* and the facts in the case now before us. I would agree there may arguably be ambiguity under the facts presented in *Salinas-Cano* regarding actual authority, joint access, and control. Under those circumstances, further inquiry by police would appear reasonable. The failure to make this further inquiry regarding actual authority, joint access, and control over what the officers knew was someone else's property was unreasonable. However, the decision in that case bears no factual similarity to the facts of our case and does not help inform the outcome here.

2. *Sixth Circuit Court of Appeals.* The case currently before us is also clearly distinguishable from the facts considered by the Sixth Circuit in *United States v. Waller.* 426 F.3d 838 (6th Cir. 2005). After a falling out with the owners of his previous residence, Waller obtained

permission from a friend to store his personal belongings in the friend's apartment. *Id.* at 842. Waller kept a brown luggage bag, garbage bags of clothing, and food at the friend's apartment. *Id.* He also ate, showered, and changed clothes at the apartment, but he did not sleep there. *Id.* Waller was later arrested in the parking lot of the apartment complex where the friend resided. *Id.* After arresting Waller in the parking lot, the arresting officers proceeded to the apartment. *Id.* Waller's friend, the tenant, advised the officers that Waller had been storing some property in his apartment. *Id.* The friend consented to the search of the apartment, and the police began searching for personal items belonging to Waller. *Id.* One of the officers found the zipped brown luggage bag in the bedroom closet, opened it, and discovered two handguns. *Id.*

Relying on *Rodriguez*, the court stated, "[W]here the circumstances presented would cause a person of reasonable caution to question whether the third party has mutual use of the property, 'warrantless entry without further inquiry is unlawful[.]' " *Id.* at 846 (alteration in original) (quoting *Rodriguez*, 497 U.S. at 188–89, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161). The court concluded that "the circumstances made it unclear whether Waller's luggage bag was 'subject to mutual use by' [his friend] and therefore the officers' warrantless entry into that luggage without further inquiry was unlawful." *Id.* at 847. As will be discussed below, ambiguous facts related to mutual use and apparent authority are not present in our case.

3. *Seventh Circuit Court of Appeals.* The facts considered by the Seventh Circuit in *United States v. Melgar* are most analogous to the facts before us now. 227 F.3d 1038 (7th Cir. 2000). In their investigation of the charges of passing counterfeit checks, officers obtained consent to search a motel room from the woman who had

rented it. *Id.* at 1039. There were a number of other people in the room when the officers arrived. *Id.* While conducting a search of the room, the officers found a purse with no identifying marks on it under the mattress of the hotel bed. *Id.* at 1040. Without inquiring further as to which of the occupants owned the purse, the officers opened it. *Id.* The court rejected the argument that the officers should have inquired further as to the actual ownership of the purse. *Id.* at 1041–42. The court concluded that apparent authority exists so long as the officer who conducts a warrantless search pursuant to third-party consent has no reliable information indicating that the consenting party has no authority over the container being searched. *Id.*

The majority rejects the Seventh Circuit's approach for requiring such "reliable information." However, I believe that requiring some reliable facts is the most logical approach. The facts are even stronger in our case. Olson, the sole tenant of the room, provided consent to search his bedroom. After being granted consent to search, police had no reason to believe there was any limitation on the consent unless some information, whether expressed by someone or clear from the circumstances, alerted the officers that the authority to search a closed container in his bedroom may be in question. A simple "that purse isn't mine" on the facts of *Melgar*, or a simple "that's not my backpack" here, would seem to suffice. Simply standing mute does not.

4. *Second Circuit Court of Appeals.* The facts of the Second Circuit's decision in *United States v. Snype* are so convoluted that even a full recitation would not, in my opinion, contribute to a principled resolution of our case. *See* 441 F.3d 119, 125–27 (2d Cir. 2006). However, the one principle that does evolve from this opinion is the approach to apparent authority taken by the Second Circuit. The

approach taken in *Snype* is that an open-ended consent to search an apartment by a lessee permits the search and seizure of any items found in the apartment with the exception of those that "obviously belonged" to another person. *Id.* at 137. This is a fact question to be decided objectively based on a review of the unique facts and circumstances of each case.

### III. Applicable Test.

The majority spends a considerable number of pages attempting to decide who has the burden of proof in a case of apparent authority to search when consent is given by a third party. There is really no question that the government bears the burden of proving that any search does not violate the Fourth Amendment. Under *Rodriguez*, when consent to a warrantless search is given by a third person, such consent must be based on actual or apparent authority. *See Rodriguez*, 497 U.S. at 188–89, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161. None of the authorities cited by the majority stand for the proposition that the defendant must come forward with evidence to show the officer could not have reasonably relied on the third-party consent. There is no burden placed on the defendant. Rather, an objective review of the facts of each case will speak for themselves. Likewise, the various competing interests discussed by the majority are already subsumed in the standards that the courts have been utilizing for decades.

In *Rodriguez*, the Court clearly established that the government has two potential avenues for meeting its burden of proving the effectiveness of third-party consent. First, the government may introduce evidence demonstrating that the person who consented to the search had actual authority to consent. *Id.* at 181, 110 S. Ct. at 2798, 111 L. Ed. 2d at 155–56. Second, the government may introduce

evidence demonstrating that the facts available to the officer at the time of the search would have warranted a person of reasonable caution in the belief that the person whose consent had been obtained had the authority to consent to the search. *Id.* at 185–86, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161. Nothing in these standards shifts the burden of proof to the defendant.

This brings us to the issue of ambiguity. The majority takes the position that any time there is a question of ownership of a container, no matter how remote or how attenuated it may be, an ambiguity exists which requires further inquiry by police. Failing to make this further inquiry makes the search unlawful. However, this is not what the law or the Constitution requires.

> *Rodriguez* neither imposes a duty of exhaustive inquiry by police before apparent authority will be found to exist, nor credits willful ignorance; it requires that the officer's belief in the consenter's authority over the place or object be objectively reasonable.

*State v. Westlake*, 353 P.3d 438, 442 (Idaho Ct. App. 2015). Police may not accept an invitation to search if the existing circumstances would cause a reasonable person to doubt the consenter's authority, absent any further inquiry. *Id.* The question here is whether a reasonable police officer, looking at all the facts available, would doubt that Olson had the authority to consent to the search of his bedroom and the contents of his bedroom, including the backpack. The answer is that there is no reasonable doubt. There is also no ambiguity requiring further inquiry. There was no Fourth Amendment violation here.

## IV. Analysis.

The parties stipulated Olson did not have actual authority to consent to the search of Jackson's backpack. In addition, the State

conceded Jackson maintained control over his backpack located in Olson's bedroom. We must therefore determine whether Olson had the apparent authority to consent to the search of Jackson's backpack. Any analysis must begin with a full recitation of the facts.

**A. Facts.** On November 13, 2012, Iowa City police officer Michael McKenna was dispatched to the On the Go BP gas station in Iowa City after a report of an armed robbery. The store clerk reported that a black male with a thin build, wearing a black mask and a red coat, entered the store, pointed a gun at him, and demanded the money in the cash register and a carton of Newport 100's cigarettes. Detective Scott Stevens of the Iowa City Police Department was the primary investigator for the On the Go BP robbery. Detective Stevens watched the surveillance video of the robbery with the store owner. The video showed a medium height, black male enter the store wearing a red coat, a black face mask, and white tennis shoes. On December 13, the store owner called Detective Stevens and told him that a customer had identified the robber as a man with the street name "Juicy." With this information, Detective Stevens was able to identify "Juicy" as Marvis Latrell Jackson. After unsuccessful attempts to reach Jackson, Detective Stevens obtained a warrant for his arrest.

At 12:35 a.m. on December 31, Iowa City police officer Michael Smithey was dispatched to Gumby's Pizza after a report of an armed robbery. The Gumby's employee told Officer Smithey that two black males had entered the restaurant wearing black hats and had black bandanas covering their faces. One of the men had pointed a handgun at him and demanded money from the cash register. The employee complied and estimated that the robbers took $125 in one dollar bills,

$50 in five dollar bills, and one twenty dollar bill. The men ran out of the store and headed northbound on Gilbert Street.

While Officer Smithey met with the employee, another man approached the officer and asked if there had been a robbery. The man stated he had just witnessed two black males walking away from the area and one of the men appeared to be holding a fistful of cash. He also stated that when the men saw him, they took off running. Officer Smithey drove the witness to the location where he had last seen the men on foot. Officer Smithey noticed footprints in the fresh snow and called for a canine unit. Officer Brandon Faulkcon and his canine partner arrived and were able to track the scent and the footprints to the southeast corner of a building located on South Gilbert Street. Also present were Officer Smithey and Officer Alex Stricker. The street level of the building was a retail establishment, while the second story contained apartments with outside doors accessible by a common stairwell in the rear of the building. The officers visually surveyed the exterior of the building. They saw lights on in one of the apartments and observed a tall black male looking out of the window inquisitively. The man appeared to match the description of one of the robbery suspects. When he saw the officers looking up at him, he quickly ducked out of sight.

After this observation, the officers decided to approach the apartment. When the officers arrived at the front door, they noticed that the lights in the apartment had been turned off. While they were standing outside the front door, they heard the apartment door lock from the inside. Officer Smithey knocked on the door and announced he was a police officer. A tall black male answered the door and identified himself as Wesley Turner. The officers explained why they were there, and Turner allowed them inside the apartment. When officers asked who

else was present in the apartment, Turner answered that it was only him, his girlfriend Alyssa Miller, and their roommate Gunnar Olson. Turner told officers that Olson was asleep in his room, but he agreed to wake him so officers could speak with him. After Turner knocked on the bedroom door, Olson, who is also a black male, emerged from his room.

The officers decided to speak with the men separately. Officer Stricker continued to speak with Turner in the living room while Officer Smithey spoke with Olson in the kitchen. Turner said he had been in the apartment since he returned home from work at 9:00 p.m. He reported he had not seen anything suspicious. When asked who lived in the apartment, Turner confirmed that he lived in the apartment with only Olson and Miller.

In the kitchen, Olson also confirmed that the only residents of the apartment were himself, Turner, and Miller. Officer Smithey asked Olson if he could look in his room. Olson told him that he had been sleeping in his room after work and awoke to find his cousin, Marvis, sleeping next to him. Upon further questioning by Officer Smithey, Olson admitted that he did not know Marvis's last name and that they were not really cousins. When Officer Smithey entered Olson's bedroom, he observed a black male—who he later identified as Jackson—lying on an air mattress, shirtless but wearing pajama bottoms. Officer Smithey observed that Jackson's neck and brow were sweaty, which he thought was odd since the apartment was not warm and no one else was sweating. Olson then attempted to wake Jackson. Officer Smithey thought it seemed considerably more difficult than it should have been to wake him. After Jackson got up, he was asked for identification. Jackson stated that he did not have any identification, but identified himself as Marvis Latrell Jackson. The officers ran Jackson's name through dispatch and were

advised of the outstanding warrant for his arrest. Officer Smithey arrested Jackson and turned him over to another officer, who removed Jackson from the apartment. Jackson did not indicate he had any personal possessions in the apartment or ask to retrieve any personal property.

After Jackson was taken from the apartment, Officer Stricker continued to speak with Olson. Olson repeated that Jackson had apparently arrived sometime earlier that evening after he had gone to sleep. He again confirmed that no one else lived in the apartment except for the three tenants. When Olson was asked whether there were any guns in the room, he replied that there should not be or that he did not know of any. Olson repeated that he lived in the bedroom alone. Officer Stricker asked Olson if he would consent to the search of his bedroom for guns or any evidence of the robbery. Olson consented. When Officer Smithey arrived, Officer Stricker informed him that Olson had consented to the search of his bedroom for guns and any evidence of the robbery. Officer Smithey confirmed with Olson that he consented to the search of his bedroom.

Officer Smithey performed the search. He began the search of the bedroom by searching under and around the air mattress and on a chair. He then grabbed a backpack that was sitting on the floor in the doorway of the bedroom closet. The backpack was closed and had no obvious identifying marks or tags. Officer Smithey opened the closed backpack and took out a wallet and placed it, unopened, on a nearby chair. Officer Smithey reached in a second time and retrieved a pair of dark jeans that were wet around the cuffs. Upon removing the jeans, Officer Smithey saw a black handgun in the backpack. After discovering the handgun, Officer Smithey discontinued his search.

Officer Smithey then checked the wallet for identification and found that it contained identification belonging to Jackson. Officer Smithey took a photograph of the handgun located inside the backpack to use in an application for a search warrant. He instructed the other officers to lock down the apartment so a search warrant could be obtained. After the officers locked down the apartment, they conducted a protective sweep. During the sweep, the officers observed a marijuana grinder and pipe, which they photographed and included in the search warrant application. Officer Smithey also included the photograph of the handgun in the application. Investigator Tom Hartshorn of the Iowa City Police Department applied for and obtained the search warrant for the apartment. Investigator Hartshorn executed the warrant and found clothes matching the description of the Gumby's robbers, in addition to money in an amount matching the description of the money taken from Gumby's.

**B. Application.** The threshold question in this case is whether, based on all of the facts presented, Officer Smithey reasonably relied on the apparent authority of Olson to consent to the search of the backpack located within his bedroom, or whether Officer Smithey reasonably needed to make further inquiry as to the ownership of the backpack. Based on the fact-intensive, objective standard that we must utilize, a reasonable person in Officer Smithey's position would have concluded that Olson had the apparent authority to consent to the search of the backpack located on the floor of his bedroom. We only need to review the facts presented here to support this conclusion.

As a starting point, contrary to the position of the majority, there is nothing ambiguous about Olson's authority to consent to the search of his room, including the backpack. The officers initiated contact with the

occupants of the apartment as part of their investigation of an armed robbery that had just occurred. Their investigation revealed a direct path leading from the site of the robbery to the door of the apartment. This all occurred between 12:35 a.m. and 1:00 a.m. There is no dispute that officers knocked on the door, identified themselves, and explained that they were investigating a robbery that had just occurred. Turner consented to their entry into the apartment. They encountered Turner's girlfriend, Miller, who also acknowledged that she lived in the apartment. Both Turner and Miller told officers that the only other person in the apartment was their roommate, Olson.

Turner went to Olson's bedroom and woke him. The officers decided to speak with the two men separately. Officer Stricker spoke with Turner. Turner indicated that he had been in the apartment since he arrived home from work at approximately 9:00 p.m. He had observed nothing suspicious. Meanwhile, Officer Smithey spoke with Olson in the kitchen. Olson confirmed he lived alone in the apartment with Turner and Miller. Olson told the officer the bedroom was his alone. Both Turner and Olson independently confirmed that there were no other tenants of the apartment, and there was no one else present in the apartment. Despite repeated affirmations from all three tenants to the contrary, when Officer Smithey asked Olson if he could peek inside his bedroom, he learned there was another person in the apartment. Olson claimed that he had gone to sleep, alone, earlier in the evening. It was only after he had been awakened by Turner that he realized his cousin Marvis had slipped into bed with him and was sleeping. When asked, Olson acknowledged that he did not know Marvis's last name and they were not really cousins.

Olson led Officer Smithey to his bedroom while Officer Stricker looked on. It is at this point that an objective review of the facts becomes critical. The majority blindly accepts the statements made by the Turner, Olson, and Miller, even in the face of their obvious incredibility and dishonesty. No one suggested that Jackson had broken into the apartment, and no one suggested that the tenants were alarmed that Jackson was found in the apartment. However, these are not facts or evidence of anything. Likewise, none of the inhabitants—Turner, Miller, or Olson—even remotely suggested to the officers that Jackson was a tenant[5] or an overnight guest.[6]

The majority is persuaded by the statements from Turner that he had been home since 9:00 p.m., that no one had recently arrived at the apartment, and that he had not observed anything suspicious. Of course, all of these statements defy credibility. Further, the majority fails to explain the obvious feigned sleep or the sweat observed on Jackson's forehead. This apparently does not require an explanation since "they found him to be cooperative once he was awake."

It was at this time that Jackson was informed of the outstanding warrant for his arrest. While neither officer could specifically remember telling Jackson to put his shirt back on before exiting the apartment, they both believe Jackson got dressed since it was the middle of winter.

---

[5]Generally, one cotenant may consent to a search of a shared living area. *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993, 39 L. Ed. 2d 242, 249–50 (1974). However, if one of the physically present cotenants does not consent to the search, the search is rendered "unreasonable and invalid" as to that cotenant. *Georgia v. Randolph*, 547 U.S. 103, 106, 126 S. Ct. 1515, 1518–19, 164 L. Ed. 2d 208, 217 (2006).

[6]Overnight guests may have a legitimate expectation of privacy in a host's home. *Minnesota v. Olson*, 495 U.S. 91, 99–100, 110 S. Ct. 1684, 1689–90, 109 L. Ed. 2d 85, 95 (1990).

The officers did not ask Jackson if he was staying in the apartment or if he had any of his belongings in the apartment. Nor do I believe they were required to do so. The officers were following up on an armed robbery that had just occurred. The robbers had fled from the scene of the robbery to the apartment. In an attempt to elude detection, Jackson threw off his clothes, jumped into Olson's bed, feigned sleep, and hoped that the tenants could prevent officers from detecting him. Officers were repeatedly told by all three tenants that there was no one else in the apartment and that no one else lived there. There is nothing ambiguous about this scenario. There is nothing in this record which would alert a reasonable officer to stop and ask Jackson whether he was staying there or whether he had any personal property located in the apartment. Of course, if Jackson wanted to alert officers that some of his property was located in Olson's bedroom, he could easily have spoken up.

Officers then asked Olson for consent to search his bedroom, which was granted. More importantly, Olson was specifically asked for consent to search his bedroom to look for guns and any evidence of the robbery. When asked if any guns would be found, he replied there should not be any guns, or at least no guns that he knew of. Olson consented to the search, without limitation. Olson also failed to inform the officers that some of the property in his bedroom might not belong to him. Neither officer asked Olson whether he owned the backpack, or confirmed with Olson that everything in his bedroom belonged to him. Again, nothing in the record would require such an inquiry. There is no ambiguity under the facts here. Nothing would have alerted Officer Smithey, as a person of reasonable caution, to question whether a backpack located near or partially in Olson's bedroom closet actually belonged to him.

Certainly there were no facts tending to show the backpack belonged to Jackson. There is simply no evidence to support this. The majority first asserts that the circumstances clearly suggested that Jackson was an overnight guest. But let's look at the facts. The majority finds significant that it was the middle of the night. However, the armed robbery the officers were investigating had occurred only minutes before. Jackson appeared to be asleep—yet the feigned heaviness of the sleep and the obvious sweat observed on Jackson's forehead belies that he was asleep. Olson told the officers that he did not know when Jackson disrobed and got into bed with him, but he was not alarmed. After first lying about Jackson's mere existence in his bedroom, Olson could not even tell the officers Jackson's last name. Under this set of facts, the majority concludes that "obviously Olson and Jackson are familiar enough that Jackson's presence in Olson's room late at night was not an unusual occurrence." I find this incredible.

The majority then enters into the realm of fantasy by suggesting that Jackson may have even had a key to the apartment because Turner and Miller did not appear to know Jackson was in the apartment and Olson claimed Jackson arrived after he was asleep. Or perhaps Jackson and someone else committed an armed robbery, Jackson ran to Turner's apartment where they were let in, Jackson ran into Olson's bedroom, disrobed and pretended to go to sleep, and hoped that Turner and Miller could hold the authorities at bay. It is inconceivable that the officers here would reasonably believe that Jackson simply arrived in Olson's bedroom when no one else was home sometime after Olson went to sleep but before Turner arrived home from work.

Second, I agree that officers would have reasonably known that Jackson was probably wearing clothing other than his pajama pants

prior to his entering Olson's bedroom. However, I do not believe that adds any cogent facts to our analysis. His clothing could have been literally anywhere in the apartment. The officers had no reason to assume an overnight guest would stuff their wet pants in a backpack. It is much more likely the guest would toss their wet pants over a chair, in the closet, or on the tub in the bathroom. The officers here were not looking for wet pants in a backpack, nor would they have any other reason to assume that the backpack belonged to Jackson. None of the facts in this record would lead a reasonable officer to question the ownership of the backpack.

Similarly, the majority claims that the officers should have somehow reasonably known that Jackson's clothes were concealed in an unmarked backpack located in Olson's bedroom because he was in his pajama pants. To support this inference, the majority repeats the already discredited story from Turner and Miller that they had no idea that Jackson was in the apartment. If they had seen his clothes in the bathroom, kitchen, or living room, then they would have known Jackson was there. The majority believes this "suggests" Jackson either changed into pajama pants in Olson's room or moved the clothing to Olson's room after changing. Then Jackson had the courtesy to stuff only his pants into the backpack, because this is the sort of container a person staying overnight in a place other than his own home might use to hold clothing and other personal items. But where is all of Jackson's other clothing? Where did he find the clothing that he presumably wore out of the apartment? Other than speculation and conjecture, there is simply nothing in these facts that aid Jackson.

Last, the qualified statements made by Olson clearly do not alert officers that he knew there were items in his bedroom that did not belong

to him, namely the backpack. Olson did not give the officers a definitive answer when asked whether there was a gun in his room. This should not come as a shock based on the lack of honesty by all of the residents of the apartment up until this time. The majority takes this uncertainty in response and again suggests Olson knew there were items in the room that did not belong to him and knew that one of those items might be a container concealing a gun. I do not believe that Olson's avoidant answer to the question about a gun suggests anything close to this to a reasonable officer, nor would it suggest anything to a reasonable person.

**C. Conclusion.** Based on all of the above unique facts and circumstances, the majority concludes a reasonable officer would have questioned the ownership of the backpack and questioned whether Olson had the apparent authority to consent to the search of it. However, this conclusion rests upon the improper application of the Constitution and case law. Our inquiry under the Federal Constitution is whether it was reasonable for Officers Smithey and Stricker to believe that Olson had authority to consent to the search of the bedroom and the backpack contained therein. *See Rodriguez*, 497 U.S. at 186, 110 S. Ct. at 2800, 111 L. Ed. 2d at 160 ("Whether the basis for such authority exists is the sort of recurring factual question to which law enforcement officials must be expected to apply their judgement; and all the Fourth Amendment requires is that they answer it reasonably."). In determining whether it was reasonable for the officers to conclude Olson had authority to consent, we apply an objective standard. *See Lowe*, 812 N.W.2d at 576. We ask if "the facts available to the officer at the moment . . . [would] 'warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.' " *Rodriguez*, 497 U.S. at 188, 110 S. Ct. at 2801, 111 L. Ed. 2d at 161 (quoting *Terry*, 392 U.S. at 21–

22, 88 S. Ct. at 1880, 20 L. Ed. 2d at 906). All of the facts presented here would warrant a man of reasonable caution to believe that Olson had the authority to consent to the search of his room and the contents therein, including the backpack.

The majority creates ambiguity in the undisputed facts by suggesting scenarios I have discounted above. Nothing in the facts suggests Jackson was either an overnight guest or staying at the apartment. There is no reasonable ambiguity here. Importantly, when officers searched the backpack, they did not know who was involved in the restaurant robbery. The point of the consent search was an attempt to find evidence of the robbery. Jackson had been arrested for an unrelated robbery that occurred weeks before. Jackson had not been arrested for the restaurant robbery that had just occurred.

The majority then leaps to the conclusion that the very purpose of the search of the backpack was to find evidence linking *Jackson* to the restaurant robbery—rather than Olson, whose bedroom was being searched. There is nothing in the record to support this statement. And there is nothing in the record to suggest the backpack even belonged to Jackson. Then the majority imputes to Officer Smithey that "he would have no motivation to open the closed backpack unless he believed it might belong to Jackson." Nothing in the record even remotely suggests this. In fact, the only evidence in the record is that officers did not know who might be involved in the restaurant robbery.

Officers were investigating a robbery and were interested in trying to find the gun that was used and any other evidence of the robbery. Olson repeatedly and unqualifiedly consented to the search of his bedroom. Nothing in the record suggests an alternative, improper motive

by officers in their search of the backpack in Olson's bedroom—certainly nothing targeting Jackson or his personal property.

Finally, the majority concludes that Officer Smithey could not reasonably rely on the apparent authority doctrine to search the backpack because it was not reasonable to believe that Olson owned it. But what evidence suggests Officer Smithey would not reasonably believe Olson owned the backpack? Officers were repeatedly told by all the occupants that only the three tenants lived there. Olson confirmed that he lived in his bedroom by himself. Olson originally denied that there was anyone else in his bedroom. When caught, he did not even know Jackson's last name.

After Olson roused him, Jackson told the officers his name, but he also told them he had no identification. Jackson did not tell officers his identification was in his wallet in his backpack located a few feet away. After being arrested on the outstanding warrant, Jackson did not alert officers that he had a backpack located nearby. The backpack was located on the floor near or in Olson's bedroom closet. During the search, Officer Smithey opened the backpack, discovered a wallet, and set it aside. According to the majority, this should somehow have alerted Officer Smithey that the backpack may belong to someone other than Olson. How does this raise that inference? We have no idea where Olson may have kept his billfold. This is not as unusual as the majority suggests, and it does not point to the backpack belonging to someone other than Olson. Many people carry their wallet in a separate bag or backpack. Further, officers had just been explicitly told by Jackson that he had no identification.

Officer Smithey reached into the backpack and discovered the jeans with the wet hem. Again, officers did not know who the jeans

belonged to, but it was easy to conclude the jeans may have been related to the robbery. The majority then concludes a reasonable officer should have suspected the backpack belonged to Jackson. I disagree. This is only evidence that someone recently came in from the outdoors—which was exactly what the officers were investigating. At this point, it was more likely for a reasonable officer to believe that the pants belonged to Olson than to someone else. The majority then faults the officers for removing the jeans from the backpack, which lead to the discovery of the gun. After this discovery, and only then, was it reasonable to determine the ownership of the backpack. It was not, as stated by the majority, to clear up any ambiguity that officers reasonably had as to the ownership of the backpack. Nothing in the record would have led a reasonable officer to doubt that Olson owned the backpack or would have put in doubt Olson's ability to consent to its search.

The facts and circumstances here were not ambiguous. Nothing in the record would put a reasonable officer on notice of any duty to make additional inquiry as to who had the authority to consent to the search of the closed backpack located in or around the closet of Olson's bedroom. There was repeated, unqualified consent to search authorized by Olson. Olson clearly had the apparent authority to consent to the search of his bedroom and the contents of his bedroom. Nothing in the record shows any ambiguity in the facts requiring officers to inquire further as to the ownership of the backpack. Consent here was valid and lawful under the Fourth Amendment and supported by numerous authorities. *See, e.g., id.* The district court was correct in denying the motion to suppress.

**V. The Defendant's Claim Under the Iowa Constitution.**

Jackson also argues that the State violated his rights under article I, section 8 of the Iowa Constitution. Article I, section 8 of the Iowa

Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated." Iowa Const. art. I, § 8. Because I would conclude that there was no violation of the Fourth Amendment to the Federal Constitution in the search conducted here, I also address Jackson's claim under the Iowa Constitution. *See Pals*, 805 N.W.2d at 772 ("When, as here, a defendant raises both federal and state constitutional claims, the court has discretion to consider either claim first or consider the claims simultaneously.").

Jackson argues this court should adopt a more stringent standard of actual authority under the Iowa Constitution than that provided by the Federal Constitution. However, the State argues that Jackson's claim under the Iowa Constitution was not preserved because he did not specifically argue that there should be a more stringent actual-authority standard under the Iowa Constitution. Jackson argues that error is preserved for appellate review when a defendant's pretrial motion to suppress is overruled. In the alternative, Jackson argues that, to the extent error was not preserved, his counsel was ineffective for failing to adequately argue for the adoption of an actual-authority standard under the Iowa Constitution.

Jackson's motion to suppress states that "the search and evidence subsequently obtained violated the defendant's rights under the 4th and 14th amendments to the United States Constitution and Article I, Section 8 of the Iowa Constitution." The motion to suppress does not argue for any other specific application or interpretation of the Iowa Constitution that would be different than under the United States Constitution. Notably, Jackson's motion to suppress did not specifically argue that the standard for consent to a warrantless search under the Iowa

Constitution should be actual authority rather than the federal apparent-authority standard. For purposes of this dissent, I assume without deciding that error was preserved because I find Jackson's claim that we should adopt an actual-authority standard under the Iowa Constitution to be without merit. *See State v. McNeal*, 867 N.W.2d 91, 99 (Iowa 2015).

1. *Iowa law.* Jackson argues that we should adopt a more stringent standard under the Iowa Constitution than that afforded under the United States Constitution and federal case law. He urges us to adopt a standard that would require a third party to have actual authority in order to consent to a search of a closed container.

Article I, section 8 of the Iowa Constitution is the "*nearly* identical [provision] to the Fourth Amendment to the United States Constitution." *State v. Short*, 851 N.W.2d 474, 500–01 (Iowa 2014) (discussing the differences in punctuation between the state constitution and the Federal Constitution and how members of this court have interpreted said differences). It provides,

> The right of the people to be secure in their persons, houses, papers and effects, against unreasonable seizures and searches shall not be violated; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched, and the persons and things to be seized.

Iowa Const. art. I, § 8. Even when we hear "cases in which no substantive distinction had been made between state and federal constitutional provisions, we reserve the right to apply the principles differently under the state constitution compared to its federal counterpart." *King v. State*, 797 N.W.2d 565, 571 (Iowa 2011). "Further, even where a party has not advanced a different standard for interpreting a state constitutional provision, we may apply the standard more

stringently than federal caselaw." *State v. Kooima,* 833 N.W.2d 202, 206 (Iowa 2013). However,

> our independent authority to construe the Iowa Constitution does not mean that we generally refuse to follow the United States Supreme Court decisions. . . . What is required under the Iowa Constitution, in each and every case that comes before us, is not mere identification of a potentially analogous federal precedent, but exercise of our best, independent judgment of the proper parameters of state constitutional commands.

*Short,* 851 N.W.2d at 490.

Only a few states have chosen to require an actual-authority standard under their own constitutions that is more stringent than the federal apparent-authority standard. *See State v. Lopez,* 896 P.2d 889, 903 (Haw. 1995) (holding that the individual giving consent to a search must possess actual authority to do so under the Hawaii Constitution); *State v. McLees,* 994 P.2d 683, 691 (Mont. 2000) (finding that under the Montana Constitution, "for third-party consent to be valid as against the defendant, the consenting party must have actual authority to do so"); *State v. Will,* 885 P.2d 715, 719 (Or. Ct. App. 1994) (finding that it was consistent with the Oregon Supreme Court precedent to require actual authority to consent to a search under the Oregon Constitution). Both Hawaii and Montana, two states that have adopted this more stringent standard, have a search and seizure provision in their state constitution that specifically grants their citizens the right to privacy—a right not contained in the Iowa search and seizure provision. Each of those cases was decided under the concept of "invasions of privacy." No comparable provision is contained in the Iowa Constitution. *Compare* Haw. Const. art. I, § 7, *and* Mont. Const. art. II, § 10, *with* Iowa Const. art. I, § 8.

Jackson also relies on the New Mexico case of *State v. Wright* for the proposition that actual authority is required under the New Mexico

Constitution. *See* 893 P.2d 455, 460–61 (N.M. Ct. App. 1995). However, the facts of that case are clearly distinguishable from the facts presented here. In that case, officers went to a trailer after receiving a tip about possible drug dealing activity. *Id.* at 457. They were met at the door by a woman. *Id.* While there was some dispute in the record as to exactly when the consent was given by the woman to look into the bedroom occupied by the defendant, there is no dispute that prior to their entry she told the officers, "Oh, it's not my place, but go ahead." *Id.* Officers proceeded to open the door to the bedroom, where they discovered the defendant and drug paraphernalia. *Id.* at 457–58. The State attempted to argue the woman who answered the door had apparent authority to consent to the search. *Id.* at 460. One of the officers testified that he did not believe what the woman told him about the trailer not being hers. *Id.* However, he also stated he thought that she might have been a babysitter. *Id.* Relying on these facts, the State argued the officer reasonably believed that she possessed common authority over the premises. *Id.*[7] The court concluded that the State's reliance on the officers' subjective belief the woman had apparent authority to consent to the search of the residence and bedroom occupied by the defendant ran counter to the provisions of article II, section 10 of the New Mexico Constitution. *Id.* at 460–61.[8]

---

[7]I note that our case does not involve a claim of common authority, which also distinguishes this case.

[8]Article II, section 10 of the New Mexico Constitution provides,

> The people shall be secure in their persons, papers, homes and effects, from unreasonable searches and seizures, and no warrant to search any place, or seize any person or thing, shall issue without describing the place to be searched, or the persons or things to be seized, nor without a written showing of probable cause, supported by oath or affirmation.

N.M. Const. art. II, § 10.

I agree with this resolution and would have reached the same result under our own Constitution. But the facts in *Wright* are a far cry from the facts in our case and warrant a different conclusion. New Mexico accepts the minority approach under its own constitution. *Id.* Consent to conduct a search may also be given by someone who is clothed with common authority or possesses some other sufficient relationship concerning the premises in question. *Id.* at 461. In *Wright*, the problem was there were no additional facts that indicated the woman granting the consent had a "sufficient relationship to the premises," and therefore, it was unreasonable for the officers to rely on her consent. *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 171, 94 S. Ct. 988, 993, 39 L. Ed. 2d 242, 250 (1974)). I suggest that, given the facts of our case, and even utilizing the standards adopted by the New Mexico court, that court would have had no problem with the consent provided by Olson.

Jackson argues that Oregon has also rejected the concept of apparent authority to the consent to a search. The Oregon Court of Appeals rejected the concept of apparent authority but stated actual authority is still required under the state constitution. *Will*, 885 P.2d at 719. The Oregon courts have stated that, "[b]efore police can enter or search without a warrant in reliance on third-party consent, they must inquire and ascertain whether the consenting party has common authority; they cannot rely on subjective good faith." *Id.* at 719–20. This approach is inapplicable to the facts of our case, and we have never adopted it. The Oregon case Jackson relies on deals with a minor's authority to consent to the search of a parent's home, a situation entirely different than the one we decide today. *Id.* at 720.

However, the vast majority of states continue to apply the federal apparent-authority standard for third-party consent to a search, and

many have done so under their own state constitutions. *See Nix v. State*, 621 P.2d 1347, 1349 (Alaska 1981); *State v. Girdler*, 675 P.2d 1301, 1305 (Ariz. 1983) (en banc); *Bruce v. State*, 241 S.W.3d 728, 731 (Ark. 2006); *Petersen v. People*, 939 P.2d 824, 831 (Colo. 1997) (en banc); *State v. Buie*, 94 A.3d 608, 609 (Conn. 2014) (per curiam); *Westlake*, 353 P. 3d at 441; *People v. Pitman*, 813 N.E.2d 93, 107 (Ill. 2004); *State v. Porting*, 130 P.3d 1173, 1178–79 (Kan. 2006); *Commonwealth v. Nourse*, 177 S.W.3d 691, 696 (Ky. 2005); *Commonwealth v. Porter P.*, 923 N.E.2d 36, 52 (Mass. 2010); *State v. Taylor*, 968 P.2d 315, 322 (Nev. 1998) (per curiam); *State v. Maristany*, 627 A.2d 1066, 1069 (N.J. 1993); *State v. Gatlin*, 851 N.W.2d 178, 183 (N.D. 2014); *State v. Linde*, 876 A.2d 1115, 1125 (R.I. 2005); *State v. Laux*, 544 S.E.2d 276, 277–78 (S.C. 2001); *Glenn v. Commonwealth*, 654 S.E.2d 910, 915 (Va. 2008); *State v. Tomlinson*, 648 N.W.2d 367, 375 (Wis. 2002); *Smallfoot v. State*, 272 P.3d 314, 318 (Wyo. 2012).

The Pennsylvania Supreme Court has held that it is not inconsistent with the Pennsylvania Constitution to only require apparent authority for a third party to consent to a search. *Commonwealth v. Hughes*, 836 A.2d 893, 902–03 (Pa. 2003). Unlike the Hawaii and Montana constitutional provisions noted above, Pennsylvania's constitutional provision on search and seizure does not include a right to privacy. *Compare* Haw. Const. art. I, § 7, *and* Mont. Const. art. II, § 10 *with* Pa. Const. art. I, § 8. Rather, Pennsylvania's search and seizure provision is more similar in content to our own search and seizure provision. *Compare* Pa. Const. art. I, § 8, *with* Iowa Const. art. I, § 8.[9]

---

[9]The Pennsylvania searches and seizures provision reads:

> The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to

I agree with the states that continue to apply the apparent authority doctrine for third-party consent to a search, which is consistent with its federal constitutional counterpart. I would not find that the Iowa Constitution should be applied more stringently, as none of the authorities cited by Jackson are similar. Nor are Jackson's authorities persuasive enough to urge the court to hold that this state should diverge from the well-established precedent under the Federal Constitution. *See State v. Jorgensen*, 785 N.W.2d 708, 713 (Iowa 2009) (noting that even when a party does advance a standard for interpreting the Iowa Constitution differently, we may still interpret it using the federal analysis if we find that the defendant did not offer "sound reasons" for the distinction).

## VI. Conclusion.

For all of the reasons set forth above, I would find that it was reasonable for the officers to conclude that Olson had the apparent authority to consent to the search of the bedroom and the backpack under the federal constitution. I would decline to adopt an actual-authority standard under the Iowa Constitution as urged by Jackson. I would affirm the decision of the court of appeals, the district court ruling on the motion to suppress, and Jackson's convictions.

Waterman and Mansfield, JJ., join this dissent.

---

search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant.

Pa. Const. art. I, § 8.